# EXHIBIT A

FILED DATE: 9/27/2021 9:05 AM  2021L009092

| | | |
|---|---|---|
| 2120 - Served | 2121 - Served | 2620 - Sec. of State |
| 2220 - Not Served | 2221 - Not Served | 2621 - Alias Sec of State |
| 2320 - Served By Mail | 2321 - Served By Mail | |
| 2420 - Served By Publication | 2421 - Served By Publication | |
| **Summons - Alias Summons** | | (12/01/20) CCG 0001 A |

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS

Name all Parties

MICHAEL A. LUMPKINS

_____

Plaintiff(s)

v.

JUUL LABS, INC., et al.

_____

Defendant(s)

See attached Service List

_____

Address of Defendant(s)

Case No. 2021 L 009092

Please serve as follows (check one):  ○ Certified Mail  ◉ Sheriff Service  ○ Alias

### SUMMONS

To each Defendant: See attached Service List

You have been named a defendant in the complaint in this case, a copy of which is hereto attached. You are summoned and required to file your appearance, in the office of the clerk of this court, within 30 days after service of this summons, not counting the day of service. If you fail to do so, a judgment by default may be entered against you for the relief asked in the complaint.

### THERE WILL BE A FEE TO FILE YOUR APPEARANCE.

To file your written appearance/answer **YOU DO NOT NEED TO COME TO THE COURTHOUSE.** You will need: a computer with internet access; an email address; a completed Appearance form that can be found at http://www.illinoiscourts.gov/Forms/approved/procedures/appearance.asp; and a credit card to pay any required fees.

**Iris Y. Martinez, Clerk of the Circuit Court of Cook County, Illinois**
cookcountyclerkofcourt.org
Page 1 of 3

**Summons - Alias Summons**        **(12/01/20) CCG 0001 B**

E-filing is now mandatory with limited exemptions. To e-file, you must first create an account with an e-filing service provider. Visit http://efile.illinoiscourts.gov/service-providers.htm to learn more and to select a service provider.

If you need additional help or have trouble e-filing, visit http://www.illinoiscourts.gov/faq/gethelp.asp or talk with your local circuit clerk's office. If you cannot e-file, you may be able to get an exemption that allows you to file in-person or by mail. Ask your circuit clerk for more information or visit www.illinoislegalaid.org.

If you are unable to pay your court fees, you can apply for a fee waiver. For information about defending yourself in a court case (including filing an appearance or fee waiver), or to apply for free legal help, go to www.illinoislegalaid.org. You can also ask your local circuit clerk's office for a fee waiver application.

Please call or email the appropriate clerk's office location (on Page 3 of this summons) to get your court hearing date AND for information whether your hearing will be held by video conference or by telephone. The Clerk's office is open Mon - Fri, 8:30 am - 4:30 pm, except for court holidays.

**NOTE: Your appearance date is NOT a court date. It is the date that you have to file your completed appearance by. You may file your appearance form by efiling unless you are exempted.**

A court date will be set in the future and you will be notified by email (either to the email address that you used to register for efiling, or that you provided to the clerk's office).

**CONTACT THE CLERK'S OFFICE for information regarding COURT DATES by visiting our website: cookcountyclerkofcourt.org; download our mobile app from the AppStore or Google play, or contact the appropriate clerk's office location listed on Page 3.**

To the officer: (Sheriff Service)

This summons must be returned by the officer or other person to whom it was given for service, with endorsement of service and fees, if any, immediately after service. If service cannot be made, this summons shall be returned so endorsed. This summons may not be served later than thirty (30) days after its date.

○ Atty. No.: 64554

○ Pro Se 99500

Name: Brian LaCien    Smith LaCien LLP

Atty. for (if applicable):

Madelene H. Tadros

Address: 70 W. Madison Street, Ste. 2250

City: Chicago

State: IL    Zip: 60602

Telephone: 312-509-8900

Primary Email: blacien@smithlacien.com

Witness date _____

9/27/2021 9:05 AM IRIS Y. MARTINEZ

IRIS Y. MARTINEZ, Clerk of Court

☐ Service by Certified Mail

☐ Date of Service: _____
(To be inserted by officer on copy left with employer or other person)

**Iris Y. Martinez, Clerk of the Circuit Court of Cook County, Illinois**

**cookcountyclerkofcourt.org**

FILED DATE: 9/27/2021 9:05 AM 2021L009092

## GET YOUR COURT DATE BY CALLING IN OR BY EMAIL

**CALL OR SEND AN EMAIL MESSAGE** to the telephone number or court date email address below for the appropriate division, district or department to request your next court date. Email your case number, or, if you do not have your case number, email the Plaintiff or Defendant's name for civil case types, or the Defendant's name and birthdate for a criminal case.

### CHANCERY DIVISION
**Court date EMAIL:** ChanCourtDate@cookcountycourt.com
Gen. Info:   (312) 603-5133

### CIVIL DIVISION
**Court date EMAIL:** CivCourtDate@cookcountycourt.com
Gen. Info:   (312) 603-5116

### COUNTY DIVISION
**Court date EMAIL:** CntyCourtDate@cookcountycourt.com
Gen. Info:   (312) 603-5710

### DOMESTIC RELATIONS/CHILD SUPPORT DIVISION
**Court date EMAIL:** DRCourtDate@cookcountycourt.com
OR
ChildSupCourtDate@cookcountycourt.com
Gen. Info:   (312) 603-6300

### DOMESTIC VIOLENCE
**Court date EMAIL:** DVCourtDate@cookcountycourt.com
Gen. Info:   (312) 325-9500

### LAW DIVISION
**Court date EMAIL:** LawCourtDate@cookcountycourt.com
Gen. Info:   (312) 603-5426

### PROBATE DIVISION
**Court date EMAIL:** ProbCourtDate@cookcountycourt.com
Gen. Info:   (312) 603-6441

### ALL SUBURBAN CASE TYPES

### DISTRICT 2 - SKOKIE
**Court date EMAIL:** D2CourtDate@cookcountycourt.com
Gen. Info:   (847) 470-7250

### DISTRICT 3 - ROLLING MEADOWS
**Court date EMAIL:** D3CourtDate@cookcountycourt.com
Gen. Info:   (847) 818-3000

### DISTRICT 4 - MAYWOOD
**Court date EMAIL:** D4CourtDate@cookcountycourt.com
Gen. Info:   (708) 865-6040

### DISTRICT 5 - BRIDGEVIEW
**Court date EMAIL:** D5CourtDate@cookcountycourt.com
Gen. Info:   (708) 974-6500

### DISTRICT 6 - MARKHAM
**Court date EMAIL:** D6CourtDate@cookcountycourt.com
Gen. Info:   (708) 232-4551

Lumpkins v. Altria Client Services, LLC, et al.

## SERVICE LIST FOR SUMMONS

Altria Client Services LLC
c/o Capital Corporate Services, Inc.
1315 W. Lawrence Avenue
Springfield, IL 62704


Altria Group Distribution Company
c/o Capital Corporate Services, Inc.
1315 W. Lawrence Avenue
Springfield, IL 62704


CEP America-Illinois, LLP
c/o Registered Agent Solutions, Inc.
3000 Professional Dr.
Suite A
Springfield, IL 62704


CEP America LLC (Vituity)
Registered Agent Solutions, Inc.
3000 Professional Drive
Suite A
Springfield, IL 62704


Walgreen Co.
c/o Illinois Corporation Service Company
801 S. Adlai Stevenson Drive
Springfield, IL 62703


Philip Morris USA Inc.
c/o Capital Corporation Services, Inc.
1315 W. Lawrence Ave.
Springfield, IL 62704


Dr. Leigh Alan Halpern, MD
15 Estate Dr.
Deerfield, IL 60015

FILED DATE: 9/27/2021 9:05 AM   2021L009092

FILED DATE: 9/27/2021 9:05 AM   2021L009092

Dr. Darren Blair Van Beek, MD
312 E. Cullerton Street
Unit C
Chicago, IL 60616


Radiology & Nuclear Consultants, Ltd.
c/o CT Corporation System
208 S. LaSalle Street, Suite 814
Chicago, IL 60604


McLane Company, Inc.
c/o CT Corporation System
208 S. LaSalle Street
Suite 814
Chicago, IL 60604


Eby-Brown Company, LLC
c/o National Registered Agents, Inc.
208 S. LaSalle Street, Suite 814
Chicago, IL 60604


Juul Labs, Inc.
c/o The Corporation Trust Company
1209 Orange Street.
Wilmington, DE 19801


Core-Mark Holding Company, Inc.
c/o National Registered Agents, Inc.
1209 Orange Street
Wilmington, DE 19801


Altria Group, Inc.
c/o Capital Corporation Services, Inc.
10 S. Jefferson Street
Suite 1400
Roanoke, VA 24011

FILED DATE: 9/27/2021 9:05 AM  2021L009092

Altria Enterprises, LLC
c/o Capital corporation Services, Inc.
10 S. Jefferson Street
Suite 1400
Roanoke, VA 24011

Alternative Ingredients, Inc.
c/o Robin W. Conner
2826 S. Elm-Eugene Street
Greensboro, NC 27406

Mother Murphy's Laboratories, Inc.
c/o Robin W. Conner
2826 S. Elm-Eugene Street
Greensboro, NC 27406

Tobacco Technology, Inc.
c/o Gregory M. Garrett, Esq.
c/o Tydings & Rosenberg, LLP
1 E. Pratt Street, Suite 901
Baltimore, MD 21202

Eliquitech, Inc.
c/o Gregory M. Garrett, Esq.
c/o Tydings & Rosenberg, LLP
1 E. Pratt Street, Suite 901
Baltimore, MD 21202

**12-Person Jury**

FILED
9/10/2021 8:29 PM
IRIS Y. MARTINEZ
CIRCUIT CLERK
COOK COUNTY, IL
14780024

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, LAW DIVISION

|  |  |  |
|---|---|---|
| MICHAEL A. LUMPKINS | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | Case No. **2021L009092** |
| | ) | |
| v. | ) | **JURY DEMANDED** |
| | ) | |
| JUUL LABS, INC., previously d/b/a as PAX LABS, INC. | ) | |
| and PLOOM INC, individually, and by and through the | ) | |
| actions and/or omissions of its actual agents, apparent | ) | |
| agents, and or employees; ALTRIA GROUP, INC., | ) | |
| individually, and by and through the actions and/or | ) | |
| omissions of its actual agents, apparent agents, and/or | ) | |
| employees; PHILIP MORRIS USA, INC., individually, | ) | |
| and by and through the actions and/or omissions of its | ) | |
| actual agents, apparent agents, and/or employees; | ) | |
| ALTRIA CLIENT SERVICES LLC, individually, and | ) | |
| by and through the actions and/or omissions of its actual | ) | |
| agents, apparent agents, and/or employees; ALTRIA | ) | |
| GROUP DISTRIBUTION COMPANY, individually, and | ) | |
| by and through the actions and/or omissions of its actual | ) | |
| agents, apparent agents, and/or employees; ALTRIA | ) | |
| ENTERPRISES LLC, individually, and by and through | ) | |
| the actions and/or omissions of its actual agents, apparent | ) | |
| agents, and/or employees; MOTHER MURPHY'S LABS, | ) | |
| INC., individually, and by and through the actions and/or | ) | |
| omissions of its actual agents, apparent agents, and/or | ) | |
| employees; ALTERNATIVE INGREDIENTS, INC., | ) | |
| individually, and by and through the actions and/or | ) | |
| omissions of its actual agents, apparent agents, and/or | ) | |
| employees; TOBACCO TECHNOLOGY, INC., | ) | |
| individually, and by and through the actions and/or | ) | |
| omissions of its actual agents, apparent agents, and/or | ) | |
| employees; ELIQUITECH, INC., individually, and by and | ) | |
| through the actions and/or omissions of its actual agents, | ) | |
| apparent agents, and/or employees; MCLANE | ) | |
| COMPANY, INC., individually, and by and through the | ) | |
| actions and/or omissions of its actual agents, apparent | ) | |
| agents, and/or employees; EBY-BROWN COMPANY, | ) | |
| LLC, individually, and by and through the actions and/or | ) | |
| omissions of its actual agents, apparent agents, and/or | ) | |
| employees; CORE-MARK HOLDING | ) | |
| COMPANY, INC., individually, and by and through the | ) | |

FILED DATE: 9/10/2021 8:29 PM   2021L009092

FILED DATE: 9/10/2021 8:29 PM    2021L009092

actions and/or omissions of its actual agents, apparent )
agents, and/or employees; WALGREENS CO., )
individually, and by and through the actions and/or )
omissions of its actual agents, apparent agents, )
and/or employees; PALOS COMMUNITY HOSPITAL )
d/b/a PALOS HOSPITAL d/b/a NORTHWESTERN )
MEDICINE PALOS HOSPITAL, individually, and by )
and through the actions and/or omissions of its actual )
agents, apparent agents, and/or employees, including )
without limit, LEIGH A. HALPERN, M.D., DARREN )
B. VAN BEEK, M.D.; LEIGH A. HALPERN, M.D., )
individually, and as actual agent, apparent agent, and/or )
employee of PALOS COMMUNITY HOSPITAL )
d/b/a PALOS HOSPITAL d/b/a NORTHWESTERN )
MEDICINE PALOS HOSPITAL, CEP AMERICA- )
ILLINOIS, LLP, and/or CEP AMERICA LLC d/b/a )
VITUITY; CEP AMERICA-ILLINOIS, LLP, individually, )
and by and through the actions and/or omissions of its )
actual agents, apparent agents, and/or employees, including, )
  without limit, LEIGH A. HALPERN, M.D.; CEP )
AMERICA LLC d/b/a VITUITY, individually, and by )
and through the actions and/or omissions of its actual )
agents, apparent agents, and/or employees, including, )
without limit, LEIGH A. HALPERN, M.D.; DARREN B. )
VAN BEEK, M.D., individually, and as actual agent, )
apparent agent, and/or employee of PALOS )
COMMUNITY HOSPITAL d/b/a PALOS HOSPITAL )
d/b/a NORTHWESTERN MEDICINE PALOS )
HOSPITAL, and/or RADIOLOGY & NUCLEAR )
CONSULTANTS, LTD.; and/or RADIOLOGY & )
NUCLEAR CONSULTANTS, LTD., including, without )
limit, DARREN B. VAN BEEK, M.D. )
)
          Defendants. )

## COMPLAINT AT LAW

NOW COMES the Plaintiff, MICHAEL LUMPKINS, by and through his attorneys,

SMITH LACIEN LLP, and complaining of the Defendant, JUUL LABS, INC., previously d/b/a

as PAX LABS, INC. and PLOOM INC., individually, and by and through the actions and/or

omissions of its actual agents, apparent agents and/or employees; ALTRIA GROUP, INC.,

individually, and by and through the actions and/or omissions of its actual agents, apparent agents,

2

FILED DATE: 9/10/2021 8:29 PM 2021L009092

and/or employees; PHILIP MORRIS USA, INC., individually, and by and through the actions and/or omissions of its actual agents, apparent agents, and/or employees; ALTRIA CLIENT SERVICES LLC, individually, and by and through the actions and/or omissions of its actual agents, apparent agents, and/or employees; ALTRIA GROUP DISTRIBUTION COMPANY, individually, and by and through the actions and/or omissions of its actual agents, apparent agents, and/or employees; ALTRIA ENTERPRISES LLC, individually, and by and through the actions and/or omissions of its actual agents, apparent agents, and/or employees; MOTHER MURPHY'S LABS, INC., individually, and by and through the actions and/or omissions of its actual agents, apparent agents, and/or employees; ALTERNATIVE INGREDIENTS, INC., individually, and by and through the actions and/or omissions of its actual agents, apparent agents, and/or employees; TOBACCO TECHNOLOGY, INC. individually, and by and through the actions and/or omissions of its actual agents, apparent agents, and/or employees; ELIQUITECH, INC., individually, and by and through the actions and/or omissions of its actual agents, apparent agents, and/or employees; MCLANE COMPANY, INC., individually, and by and through the actions and/or omissions of its actual agents, apparent agents, and/or employees; EBY-BROWN COMPANY, LLC, individually, and by and through the actions and/or omissions of its actual agents, apparent agents, and/or employees; CORE-MARK HOLDING COMPANY, INC., individually, and by and through the actions and/or omissions of its actual agents, apparent agents, and/or employees; WALGREENS CO., individually, and by and through the actions and/or omissions of its actual agents, apparent agents, and/or employees; PALOS COMMUNITY HOSPITAL d/b/a PALOS HOSPITAL d/b/a NORTHWESTERN MEDICINE PALOS HOSPITAL, individually, and by and through the actions and/or omissions of its actual agents, apparent agents, and/or employees, including without limit, LEIGH A. HALPERN, M.D.,

3

FILED DATE: 9/10/2021 8:29 PM 2021L009092

DARREN B. VAN BEEK, M.D.; LEIGH A. HALPERN, M.D., individually, and as actual agent, apparent agent, and/or employee of PALOS COMMUNITY HOSPITAL d/b/a PALOS HOSPITAL d/b/a NORTHWESTERN MEDICINE PALOS HOSPITAL, CEP AMERICA-ILLINOIS, LLP, and/or CEP AMERICA LLC d/b/a VITUITY; CEP AMERICA-ILLINOIS, LLP, individually, and by and through the actions and/or omissions of its actual agents, apparent agents, and/or employees, including, without limit, LEIGH A. HALPERN, M.D.; CEP AMERICA LLC d/b/a VITUITY, individually, and by and through the actions and/or omissions of its actual agents, apparent agents, and/or employees, including, without limit, LEIGH A. HALPERN, M.D.; DARREN B. VAN BEEK, M.D., individually, and as actual agent, apparent agent, and/or employee of PALOS COMMUNITY HOSPITAL d/b/a PALOS HOSPITAL d/b/a NORTHWESTERN MEDICINE PALOS HOSPITAL, and/or RADIOLOGY & NUCLEAR CONSULTANTS, LTD.; and/or RADIOLOGY & NUCLEAR CONSULTANTS, LTD., including, without limit, DARREN B. VAN BEEK, M.D., pleading hypothetically and in the alternative, states as follows:

## GENERAL ALLEGATIONS
### Introduction

1.      Until 2014, rates of smoking and nicotine addiction were at an all time low. However, the launch of the e-cigarette produce by JUUL LABS INC., ("JUUL"), change this.

2.      Adam Bowen ("Bowen") and James Monsees ("Monsees") viewed this declining industry as an opportunity to market their new JUUL e-cigarette product.

3.      Bowen and Monsees succeeded in creating and marketing their product with the help of early investors and board members, Nicolas Pritzker ("Pritzker"), Huyong Huh ("Huh"), and Riaz Valani ("Valani"), which caused the addition of millions of youths, stopped millions of adults from overcoming their nicotine addictions, and earned billions of dollars in profits.

4

FILED DATE: 9/10/2021 8:29 PM   2021L009092

4.      Monsees, cofounded Ploom, Inc. with defendant, Bowen, and he served as Chief Executive Officer of JUUL until October 2015. Since October 2015, Monsees has been a Chief Product Officer of JUUL. At all times relevant, Monsees has been a member of the Board of Directors of JUUL or its predecessors.

5.      At all times relevant, Bowen served as both the Chief Technology Officer and a member of the Board of Directors of JUUL or its predecessors.

6.      In 2007, Pritzker invested in JUUL[1].

7.      Since at least 2015, Huh has been on the Board of Directors of JUUL or its predecessors.

8.      Since at least May 2011, Valani has been on the Board of Directors of JUUL or its predecessors.

9.      Together Monsees, Bowen, Pritzker, Huh, and Valani are referred to as the Management.

10.     JUUL had the help of ALTRIA, a cigarette giant, who the JUUL founders praised for creating "the most successful consumer product of all time...an amazing product."[2]

11.     JUUL founder Monsees claims that JUUL e-cigarettes are "one of the greatest advances in public health in our lifetime."[3]

---

[1] Ainsley Harris, How JUUL went from a Stanford thesis to $16 billion startup, Fast Company (March 8, 2020 4:11PM PST), https://www.fastcompany.com/90263212/how-JUUL-went-froma-stanford-thesis-to-16-billion-startup.

[2] Chaykowski, *Billionaires-to-be: Cigarette breakers - James Monsees and Adam Bowen have cornered the US e-cigarette market with Juul. Up next: The world*, FORBES Magazine (Sep 27, 2018), www.forbesindia.com/article/leaderboard/billionairestobe-cigarette-breakers/51425/1 (as of July 5, 2019).

[3] Id.

FILED DATE: 9/10/2021 8:29 PM 2021L009092

12.     Nicotine is the chemical that is the fundamental reason that people persist in using tobacco products posing the risk of pulmonary injuries, cardiovascular disease and other serious, and often fatal conditions.

13.     Nicotine addiction causes repeated exposure to the toxins and aerosols contained in JUUL e-cigarettes' vapor.

14.     In an article published by The Journal of Physiology, researchers state that "electronic vaporization of nicotine likely promotes the same addictive behaviors as nicotine exposure through conventional means, resulting in increased chronic/repeated use, which will have deleterious effects in the brain and lung."[4]

15.     Similarly, recent studies suggest that there are undoubtedly toxic effects of electronic cigarette vapor exposure on vital organs, but there has also been demonstrated evidence that "e-Cig vaping could alter BBB permeability and worsen ischemic brain injury."[5]

16.     A further study showed that "Chronic e-Cig vaping could be prodromal to cerebrovascular impairment and promote cerebrovascular conditions that favor the onset of stroke and post-ischemic brain injury."[6]

17.     Research done on mice suggests that "inhalation of E-cigarette vapor daily for 1 month leads to systemic alterations in host defenses with diminished recruit of murine neutrophils

[4] Herman, M., & Tarran, R. (2020). E-cigarettes, nicotine, the lung and the brain: Multi-level cascading pathophysiology. *The Journal of Physiology*, 598(22), 5063-5071. DOI: 10.1113/JP278388.

[5] Sifat, A., Vaidya, B., Kaisar, M.A., Cucullo, L., & Abbruscato, T. (2018). Nicotine and electronic cigarette (E-Cig) exposure decreases brain glucose utilization in ischemic stroke. Journal of Neurochemistry, 147, 204-221. DOI:10.1111/jnc.14561.

6 Kaisar, M.A., Villalba, H., Prasad, S., Liles, T., Sifat, A.E., Sajja, R.K., Abbriscato, T.J., & Cicullo, L. (2017). Offsetting the impact of smoking and e-cigarette vaping on the cerebrovascular system and stroke injury: Is Metformin a viable countermeasure? Redox Biology, 13, 353-362. DOI: 10.1016/j.redox.2017.06.006

FILED DATE: 9/10/2021 8:29 PM 2021L009092

to the site of bacterial infection."[7] This study showed that smoking e-cigarettes weakens the consumers immune system, thus making them more susceptible to infections and the progression of infections.

18.    A further study looked to the effect of e-cigarette aerosols on the immune system and found that e-cigarette users had a "higher abundance of Porphyromonas and Veillonella than compared to non-users and users of e-cigarettes had highly elevated levels of Interleukin (IL)-6 and IL-1β."[8] The study concludes that Epithelial cells-exposed e-cigarette aerosols were more susceptible for infection and the progression of infections, meaning that "e-cigarette users are more prone to infection."[9]

19.    Streptococcus Intermedius infection is known to be a cause of brain abscess.[10] Typically, the species is present inside the human body and only becomes pathogenic when its "virulence factors – including hyaluronic acid, deoxyribonuclease, and chondroitin sulfate -- are activated."[11]

20.    A study found that Streptococcus mutans cells grew at a faster rate when exposure to nicotine-rich e-cigarettes. In fact, the "biofilm mass ranged from 8 ± 0.5 mg with the control to 47 ± 5 mg after six exposures to nicotine-rich e-cigarettes."[12]

---

[7] Ross Corriden, et. al., E-cigarette use increases susceptibility to bacterial infection by impairment of human neutrophil chemotaxis, phagocytosis, and NET formation, American Physiological Society, (October 22, 2020), journals.physiology.org/journal/ajpcell

[8] Smruti Pushalkar, et. al., Electronic Cigarette Aerosol Modulates the Oral Microbiome and Increases Risk of Infection, (March 27, 2020), https://www.cell.com/iscience/fulltext/S2589-0042(20)30068-7?_returnURL=https%3A%2F%2Flinkinghub.elsevier.com%2Fretrieve%2Fpii%2FS2589004220300687%3Fshowall%3Dtrue

[9] Id.

[10] Tobe Momah, MD, Brain Abscess Due to Streptococcus Intermedius Infection, Neurology Consultant, (December 5, 2018), https://www.consultant360.com/article/consultant360/brain-abscess-due-streptococcus-intermedius-infection?page=2

[11] Id.

[12] Mahmoud Rouabhia, Abdelhabib Semlali, Electronic cigarette vapor increases Streptococcus mutans growth, adhesion, biofilm formation, and expression of the biofilm-associated genes, Oral Diseases, (July 19, 2020), https://onlinelibrary.wiley.com/doi/10.1111/odi.13564

7

FILED DATE: 9/10/2021 8:29 PM   2021L009092

21.     Products designed by JUUL were intended to create addiction, not break it by developing nicotine formulas and delivery methods that are much stronger than combustible cigarettes while being less harsh on the throat.

22.     In marketing its products JUUL, along with Bowen, Monsees, Pritzker, Huh, Valani, and ALTARIA, engaged in a campaign of deceit through channels of mass media and social media communication, advertisements, and/or otherwise where they showed JUUL products alongside healthy meals, coffee, positioning JUUL products as part of a daily routine, and claiming JUUL products to be as safe as coffee.

23.     JUUL led a marketing campaign called "Make the Switch" which mislead consumers into thinking that JUUL products were benign smoking cessation devices, even though JUUL never designed its products to break addiction.

24.     JUUL partnered with veteran cigarette industry marketers including, but not limited to, ALTARIA and PHILIP MORRIS USA, INC. ("PHILIP MORRIS"), to ensure premium shelf space for its products to lure in e-cigarette users.

25.     Overall JUUL's marketing efforts were very successful and when JUUL was experiencing its greatest growth in sales, most adults and youths believed that e-cigarettes did not contain nicotine at all.

26.     JUUL deceived users of JUUL products into believing that breathing the aerosol is as harmless as puffing room air but this is not the case. Not only are the flavors in the JUUL products themselves toxic and dangerous, but they have never been adequately tested to ensure they are safe for inhalation.

8

FILED DATE: 9/10/2021 8:29 PM   2021L009092

27.     It is well established that flavoring additives and raw ingredients used in JUUL e-liquids are known causes of lung injuries when inhaled in the workplace setting.[13]

28.     Safety and toxicity analyses in the context of flavored e-liquids have also been published in medical and scientific literature.

29.     In 2016, Tierney, et al., performed an analysis of the ingredients in several popular flavors and brands of e-cigarettes. They found that the concentration of artificial flavor chemicals in e-cigarette fluids are sufficiently high for inhalation exposure by vaping to be of toxicological concern. Also, the researchers found that certain flavoring additives appeared to be popular across all brands such as vanillin, ethyl vanillin, maltol and ethyl maltol, benzaldehyde and benzyl alcohol, ethyl butyrate and ethyl acetate. A review of the JUUL master formulations and ingredient lists for flavored JUUL pods identify many of these same popular toxic ingredients studied by Tierney.[14]

30.     A 2018 study examined the effect of popular e-cigarette flavoring on cells. The authors found that cell exposure to diacetyl, cinnamaldehyde, acetoin, pentanedione, o-vanillin, maltol, and coumarin without nicotine caused cytotoxicity dose-dependently. Mixing a greater variety of flavors resulted in an even greater cytotoxicity and cell-free ROS levels compared to treatments with individual flavors.[15]

---

[13] Flavorings-Related Lung Disease, Exposure To Flavoring Chemicals: What Are Flavorings?, National Institute for Occupational Safety and Health (October 3, 2017), https://www.cdc.gov/niosh/topics/flavorings/exoosure.html
[14] Peyton A Tierney, et al., Flavour chemicals in electronic cigarette fluids, Tob Control, 25:e10-e15, Apr. 15, 2015.
[15] Thivanka Muthumalage, et al., Inflammatory and Oxidative Responses Induced by Exposure to Commonly Used e-Cigarette Flavoring Chemicals and Flavored e-Liquids without Nicotine, 8 Frontiers in Physiology 1130 (2018).

FILED DATE: 9/10/2021 8:29 PM    2021L009092

31.    Talih, et al. analyzed the characteristics and toxicant emissions of JUUL and found that JUUL aerosol contained numerous toxic carbonyl compounds including formaldehyde, acetaldehyde and acetone, all known carcinogens.[16]

32.    Another study published in 2019 examined the artificial flavoring additives in eliquids in JUUL pods. The authors concluded that the cumulated data suggested that artificial flavors induce oxidative stress, inflammation, epithelial barrier dysfunction, and DNA damage in lung cells. Specifically, JUUL crème brulee and cool cucumber caused epithelial barrier dysfunction in 16-HBE cells. Moreover, all flavors damaged DNA upon exposure in monocytes. The findings included increased mitochondrial superoxide generation, IL-8 inflammatory cytokine response, IL-8 inflammatory cytokine response in monocytes, and OGE2 response in monocytes. All findings are a known cause of acute and chronic lung injuries, as well as other serious and significant injuries.[17]

33.    A number of other studies have examined the effects of exposure to inhaled flavoring additives in e-liquids and determined that inhalation of flavoring additives in e-cigarette aerosol carry a significant risk of toxicity and other injuries.[18]

---

[16] Talih S, Salman R, El-Hage R, et al., Characteristics and toxicant emissions of JUUL electronic cigarettes, Tobacco Control 2019;28:678-680.

[17] Thivanka Muthumalage, et al., E-cigarette flavored pods induce inflammation, epithelial barrier dysfunction, and DNA damage in lung epithelial cells and monocytes, Scientific Reports, 9:19035 (Feb. 1, 2019).

[18] Jessica L. Fetterman, et al., Flavorings in Tobacco Products Induce Endothelial Cell Dysfunction, Arterioscler Thromb Vasc Biol (July 2018); Isaac Sundar, et al., E-cigarettes and flavorings induce inflammatory and prosenescence responses in oral epithelial cells and periodontal fibroblasts, Oncotarget, 7(47): 77196-204 (Oct. 24, 2016); Hae-Ryung Park, et al., Transcriptomic response of primary human airway epithelial cells to flavoring chemicals in electronic cigarettes, Scientific Reports, 9:1400, (Feb. 1, 2019); Chad A. Lerner, et al., Vapors Produced by Electronic Cigarettes and E-Juices with Flavorings Induce Toxicity, Oxidative Stress, and Inflammatory Response in Lung Epithelial Cells and in Mouse Lung, PLoS ONE, 10(2): e0116732, (Feb. 6, 2015); Michael S. Werley, et al., Toxicological assessment of a prototype e-cigaret device and three flavor formulations: a 90-day inhalation study in rats, Inhalation Toxicology, 28(1), 22-28, (Jan. 18, 2016); Wavreil FDM, Heggland SJ, Cinnamonflavored electronic cigarette liquids and aerosols induce oxidative stress in human osteoblastlike MG-63 cells, Toxicology Reports (2019), doi: https://doi.org/10.1016/j.toxrep.2019.11.019; Behar, et al., Analytical and toxicological evaluation of flavor chemicals in electronic cigarette refill fluids, Scientific Reports, (May 29, 2018).

FILED DATE: 9/10/2021 8:29 PM 2021L009092

34.     In addition, there is evidence that combining a number of flavoring additives into an e-liquid formulation can significantly increase toxicity.[19]

35.     Despite the body of evidence demonstrating a significant risk associated with the flavoring additives used in JUUL e-liquids, JUUL, ALTARIA, PHILIP MORRIS, and/or the other Defendants failed to warn consumers or the public, including Plaintiff, MICHAEL LUMPKINS ("LUMPKINS"), of this risk thereby recklessly disregarding the safety of the millions of JUUL Product users throughout the country.

36.     Older adults who switched to JUUL products in hopes of ending their nicotine addiction, ended up furthering it. As one of the JUUL founders said, "We don't think a lot about addiction here because we're not trying to design a cessation product at all… anything about health is no on our mind."[20]

37.     Studies have shown that older adults who switch to JUUL are more susceptible to cardiovascular and pulmonary problems, and CDC data shows that older patients hospitalized due to vaping lung related conditions had much longer hospital stays than younger patients.

**Plaintiff**

38.     On or about September 10, 2019, and at all times material, Plaintiff, LUMPKINS resided at 6362 Orchard Drive, Palos Heights, County of Cook, State of Illinois.

---

[19] Marescotti D, et al., Systems toxicology assessment of a representative e-liquid formulation using human primary bronchial epithelial cells, Toxicology Reports (2019), doi: https://doi.org/10.1016/j.toxrep.2019.11.016; Temperance R. Rowell, et al., Electronic Cigarettes: Not All Good News? Flavored e-cigarette liquids reduce proliferation and viability in the CALU3 airway epithelial cell line, Am. J. Physiol. Lung Cell Mol. Physiol., 313:L52-L66 (Apr. 14, 2017).
[20] Tiku, *Startup behind the Lambo of vaporizers just launched an intelligent e-cigarette: Surprise, it's a rectangle*, The Verge (April 21, 2015) www.theverge.com/ 2015/4/21/8458629/pax-labs-ecigarette-juul (as of July 5, 2019).

**The JUUL Defendants**

39.    On or about September 10, 2019, and at all times material, Defendant, JUUL

LABS, INC. ("JUUL") was and is a Delaware corporation, with its principal place of business in

San Francisco, California. Ploom, Inc., a predecessor company to JUUL, was incorporated in

Delaware. Ploom, Inc., then changed its name to PAX Labs, Inc and then changed its name to

JUUL LABS, INC. while forming a new subsidiary with the name PAX Labs, Inc.

40.    JUUL designs, manufactures, sells, markets, advertises, promotes and distributes

e-cigarettes devices, JUUL pods and accessors (collectively "JUUL Products").

41.    Prior to the formation of separate entities PAX Labs, Inc. and JUUL in or around

April 2017, JUUL designed, manufactured, sold, marketed, advertised, promoted, and distributed

JUUL Products under the name PAX Labs, Inc.

42.    Together with its predecessors JUUL LABS, INC. shall be referred to as "JUUL."

43.    On or about September 10, 2019, and at all times material, Defendant, ALTRIA

GROUP, INC., ("AGI") was and is a Virginia corporation, with its principal place of business in

Richmond, Virginia.

44.    On or about December 20, 2018, and at all times material, Defendant, AGI

purchased a 35% stake in JUUL. AGI and JUUl executed a Service Agreement that provides that

AGI though its subsidiaries, would assist JUUL in selling, marketing, promoting, and/or

distributing JUUL Products, among other things.

45.    On or about September 10, 2019, and at all times material, Defendant, PHILIP

MORRIS USA, was and is a wholly-owned subsidiary of AGI. PHILIP MORRIS was and is a

Virginia corporation with its principal place of business in Richmond, Virginia.

FILED DATE: 9/10/2021 8:29 PM   2021L009092

FILED DATE: 9/10/2021 8:29 PM    2021L009092

46.     PHILIP MORRIS performs direct marketing support services for JUUL under the Services Agreement to assist JUUL in selling, marketing, and/or promoting JUUL, including, but not limited to, placing JUUL Product inserts in millions of packs of L&M, Parliament, and Marlboro cigarettes and utilizing PHILIP MORRIS's extensive consumer market database for targets direct marketing purposes.

47.     On or about September 10, 2019, and at all times material, Defendant, ALTRIA CLIENT SERVICES LLC ("ACS"), was and is a limited liability company with its principal place of business in Richmond, Virginia.

48.     On or about September 10, 2019, and at all times material, Defendant, ALTRIA GROUP DISTRIBUTION COMPANY ("AGDC"), was and is a limited liability company with its principal place of business in Richmond, Virginia.

49.     On or about September 10, 2019, and at all times material, Defendant, ALTRIA ENTERPRISES LLC ("AE") was and is a wholly-owned subsidiary of AGI. AE was and is a limited liability company with its principal place of business in Richmond, Virginia.

50.     AGI, PHILIP MORRIS, ACS, AGDC, and AE are referred to jointly as the "ALTRIA DEFENDANTS" or "ALTRIA."

51.     AE is a party to the purchase agreement between AGI AND JUUL and AE purchased ALTRIA's stake in JUUL on behalf of ALTRIA.

52.     JUUL and the ALTRIA DEFENDANTS are referred to jointly as the "JUUL DEFENDANTS."

13

FILED DATE: 9/10/2021 8:29 PM    2021L009092

### The E-Liquid Manufacturing Defendants

53.     On or about September 10, 2019, and at all times material, Defendant, MOTHER MURPHY'S LABS, INC. ("MOTHER MURPHY'S") was a North Carolina corporation, with a principal place of business in Greensboro, North Carolina.

54.     On or about September 10, 2019, and at all times material, Defendant, MOTHER MURPHY'S, was in the business of manufacturing and supplying E-Liquids and the ingredients and additives in E-Liquids including the E-Liquid in JUUL Products.

55.     On or about September 10, 2019, and at all times material, Defendant, ALTERNATIVE INGREDIENTS, INC. ("ALTERNATIVE") was a wholly-owned subsidiary of Defendant, MOTHER MURPHY'S.

56.     On or about September 10, 2019, and at all times material, Defendant, ALTERNATIVE, was a North Carolina corporation, with a principal place of business in Greensboro, North Carolina.

57.     On or about September 10, 2019, and at all times material, Defendant, ALTERNATIVE, was in the business of manufacturing and supplying E-Liquids, flavoring additives and raw ingredients in E-Liquids, including the E-Liquid in JUUL Products.

58.     On or about September 10, 2019, and at all times material, Defendant, TOBACCO TECHNOLOGY, INC. ("TTI"), was a Maryland corporation with a principal place of business in Eldersburg, Maryland.

59.     On or about September 10, 2019, and at all times material, Defendant, TTI, was in the business of manufacturing and supplying E-Liquids, flavoring additives and raw ingredients in E-Liquids, including the E-Liquid in JUUL Products.

14

FILED DATE: 9/10/2021 8:29 PM   2021L009092

60.     On or about September 10, 2019, and at all times material, Defendant, ELIQUITECH, INC. ("ELIQUITECH"), was a wholly-owned subsidiary of Defendant, TTI.

61.     On or about September 10, 2019, and at all times material, Defendant, ELIQUITECH, was a Maryland corporation, with a principal place of business in Eldersburg, Maryland.

62.     On or about September 10, 2019, and at all times material, Defendant, ELIQUITECH, was in the business of manufacturing and supplying E-Liquids, flavoring additives and raw ingredients in E-Liquids, including the E-Liquid in JUUL Products.

63.     Defendants, MOTHER MURPHY'S, ALTERNATIVE, TTI, and ELIQUITECH, are jointly referred to as the "E-LIQUID MANUFACTURING DEFENDANTS."

**The Distributor Defendants**

64.     On or about September 10, 2019, and at all times material, Defendant, MCLANE COMPANY, INC. ("MCLANE") was a Texas corporation with a principal place of business in Temple, Texas.

65.     On or about September 10, 2019, and at all times material, Defendant, MCLANE, was a wholly-owned subsidiary of Berkshire Hathaway[21].

66.     On or about September 10, 2019, and at all times material, Defendant, EBY-BROWN COMPANY, LLC ("EBY-BROWN"), was a Delaware limited liability company with a principal place of business in Naperville, Illinois.

67.     In 2019, Defendant, EBY-BROWN, was acquired by Performance Food Group.

---

[21] https://www.mclaneco.com/content/mclaneco/en/home.html.

15

FILED DATE: 9/10/2021 8:29 PM   2021L009092

68.     On or about September 10, 2019, and at all times material, Defendant, CORE-MARK HOLDING COMPANY, INC. ("CORE-MARK"), was a Delaware corporation with a principal place of business in Westlake, Texas.

69.     On or about September 10, 2019, and at all times material, Defendant, WALGREENS CO. ("WALGREENS"), was and is an Illinois corporation with its principal place of business in Deerfield, Illinois.

70.     Defendants, MCLANE, EBY-BROWN, CORE-MARK, and WALGREENS will be jointly referred to as the "DISTRIBUTOR DEFENDANTS."

## The Medical Defendants

71.     On or about September 10, 2019, and at all times material, Defendant, PALOS COMMUNITY HOSPITAL d/b/a PALOS HOSPITAL d/b/a NORTHWESTERN MEDICINE PALOS HOSPITAL ("PALOS"), was and is an Illinois not-for-profit corporation with its principal place of business in Palos Heights, Illinois.

72.     On or about September 10, 2019, and at all times material, Defendant, LEIGH A. HALPERN, M.D. ("HALPERN"), was an Illinois licensed physician specializing in emergency medicine.

73.     On or about September 10, 2019, and at all times material, Defendant, HALPERN, resided at 15 Estate Dr., Deerfield, Lake County, Illinois.

74.     On or about September 10, 2019, and at all times material, Defendant, CEP AMERICA-ILLINOIS, LLP ("CEP ILLINOIS"), was and is an Illinois limited liability partnership.

16

FILED DATE: 9/10/2021 8:29 PM    2021L009092

75.     On or about September 10, 2019, and at all times material, Defendant, CEP AMERICA LLC d/b/a VITUITY ("VITUITY"), was and is a Delaware limited liability company with a principal place of business in Arlington Heights, Illinois.

76.     On or about September 10, 2019, and at all times material, Defendant, HALPERN, was employed as a group physician by CEP ILLINOIS.

77.     On or about September 10, 2019, and at all times material, Defendant, HALPERN, was employed as a group physician by VITUITY.

78.     On or about September 10, 2019, and at all times material, Defendant, DARREN VAN BEEK, M.D. ("VAN BEEK"), was an Illinois licensed physician specializing in interventional radiology and diagnostic radiology.

79.     On or about September 10, 2019, and at all times material, Defendant, VAN BEEK, resided at 312 E. Cullerton St., Unit C, Chicago, Cook County, Illinois.

80.     On or about September 10, 2019, and at all times material, Defendant, RADIOLOGY & NUCLEAR CONSULTANTS, LTD. ("RADIOLOGY"), was and is an Illinois corporation with a principal place of business in Oak Brook, Illinois.

81.     On or about September 10, 2019, and at all times material, Defendant, VANBEEK, was employed as a group physician by RADIOLOGY.

**Background**

82.     JUUL set out to "deliver solutions that refresh the magic and luxury of the tobacco category."[22]

---

[22] Mings, *Ploom model Two Slays Smoking with Slick Design and Heated Tobacco Pods*, Solid Smack (Apr 23, 2014), www.solidsmack.com/ design/ploom-modeltwo-slick-design-tobacco-pods/ (as of July 5, 2019).

FILED DATE: 9/10/2021 8:29 PM    2021L009092

83.    Monsees, publicly admitted that JUUL built its e-cigarette business by first consulting cigarette industry documents, including board meeting minutes, made public under the Master Settlement Agreement that had been reached between the cigarette industry, government officials, and injured smokers. "[Industry documents] became a very intriguing space for us to investigate because we had so much information that you wouldn't normally be able to get in most industries. And we were able to catch up, right, to a huge, huge industry in no time. And then we started building prototypes."[23]

84.    JUUL researched how cigarette companies had chemically manipulated nicotine content to maximize delivery.[24] JUUL used other patents to determine the most effective way to manipulate nicotine pH to maximize the delivery of nicotine in a flavored vapor that has very little harshness or "throat hit." This combination created unprecedented risks of nicotine abuse and furthered the public health issue of nicotine addiction.

85.    JUUL looked to other patents to determine the "people who understood the science"[25] and hired those scientists as advisors, helping develop JUUL Products.

86.    Upon information and belief, Defendant, JUUL, entered into an agreement in California with Defendant MOTHER MURPHY'S and Defendant ALTERNATIVE in or around 2014 wherein in conjunction with JUUL, MOTHER MURPHY'S and ALTERNATIVE designed, manufactured and supplied flavoring additives and the flavored E-liquids pursuant to JUUL directives and specifications derived from their patents for use in its JUUL Products. Upon information and belief, MOTHER MURPHY'S and ALTERNATIVE continue to design,

---

[23] Montoya, *Pax Labs: Origins With James Monsees*, Social Underground,
https://socialunderground.com/2015/01/pax-ploom-origins-future-james-monsees/ (as of July 5, 2019).
[24] *Id.*
[25] Pierce, *This Might Just Be The First Great E-Cig*, WIRED, (Apr 21, 2015), www.wired.com/2015/04/pax-juul-ecig/
(as of July 5, 2019).

FILED DATE: 9/10/2021 8:29 PM   2021L009092

manufacture and supply flavoring additives and flavored e-liquids to JUUL for use in its JUUL

pods presently.

87.     MOTHER MURPHY'S and ALTERNATIVE would use their own chemical

additives and flavorings to formulate the e-liquids but "the overall manufacturing processes are

unique to the JUUL system and the formulas and chemistries for the e-liquids for the JUUL system,

are proprietary to JUUL" as alleged in JUUL's responses to Congress.[26]

88.     MOTHER MURPHY'S and ALTERNATIVE would report regularly to JUUL as

to the production processes and progress and took direction from JUUL in California as to business

directives, including phone calls, e-mails and regular forms of electronic communication coming

from JUUL in California.

89.     Upon information and belief, MOTHER MURPHY'S and ALTERNATIVE

performed "one-third of the final nicotine production" for JUUL products that go into the e-liquid

mix.[27]

90.     Defendant MOTHER MURPHY'S describes itself as "an industry leader in flavor

innovation." According to its website: "MOTHER MURPHY'S is a food flavoring business,

family-owned and operated since 1946. We ship food flavorings, flavor extracts and powered

flavorings to over 30 different countries. We are very innovative, and our in-house chemists are

always developing and seeking new flavor extracts and powdered flavorings to add to our library

of already more than 60,000 flavors. In fact, we say 'if you can imagine it, we can create it'."[28]

91.     Upon information and belief, MOTHER MURPHY'S is the parent company of

ALTERNATIVE. ALTERNATIVE's website was taken down in the Fall of 2019 when news

---

[26] "Responses of JUUL LABS INC. to Questions for the Record at the July 25, 2019 Hearing before the House
Committee on Oversight and Record Examining JUUL's role in the Youth Nicotine Epidemic: Part II p. 6.
[27] *Id.*
[28] http://www.mothermurphys.com/

broke that a lawsuit had been filed by a former JUUL employee alleging that ALTERNATIVE supplied over a million contaminated pods which JUUL sold to users, with reckless disregard for consumer safety.

92.     A snapshot of ALTERNATIVE's website from 2016 accessed through wayback.org internet archive, describes ALTERNATIVE as "Established in Greensboro, North Carolina, ALTERNATIVE Ingredients, Inc. was created to serve the relatively new Vaping Industry, also known as the Electronic Nicotine Delivery Systems (ENDS) industry. Our product offering include E-Flavor Concentrates, Nicotine Solutions and finished E-Liquids." It also states that:

> We emphasize that while we have sought to create a group of flavors compatible with the ENDS industry, to our knowledge, no independent studies have been conducted which document the safety of these flavors in a vaping environment or in e-cigarettes. We expect that these studies will be forthcoming, but until they are released, we make no representation or warranty as to the safety of these flavors when used in a vaping environment or in e-cigarettes.[29] (emphasis added).

However, no such warning was provided when the e-liquids were shipped and/or sold to millions of consumers throughout the United States. MOTHER MURPHY'S and ALTERNATIVE did not see to it that JUUL provide the same reservation as to lack of safety tasting and lack of warranty as to the safety of the chemical flavoring additives to the consumers that they themselves cautioned about to their potential vaping industry customers.

93.     In conjunction with JUUL, MOTHER MURPHY'S and ALTERNATIVE designed, manufactured, and supplied flavoring ingredients for JUUL e-liquids utilizing flavoring additives, which were never tested for safety risks associated with inhalation in e-cigarettes. Accordingly, JUUL, MOTHER MURPHY'S and ALTERNATIVE's design, manufacture, and

---

[29] https://web.archive.org/web/20160312122149/http://www.alternativeingredients.com/

FILED DATE: 9/10/2021 8:29 PM   2021L009092

FILED DATE: 9/10/2021 8:29 PM    2021L009092

supply of JUUL e-liquids was done with reckless disregard for the safety of consumers including, Plaintiff, LUMPKINS, and millions of teenagers, young adults and older adults who unknowingly inhaled e-liquids containing flavoring additives that were never tested to determine whether they were safe for use in this manner and for which Defendants knew, or should have known, carried a severe and significant inhalation risk to the lung and other organs. MOTHER MURPHY'S and ALTERNATIVE placed JUUL e-liquids into the stream of commerce with the full knowledge that it was unsafe for use in the manner for which it was intended. MOTHER MURPHY'S and ALTERNATIVE knew, or should have known, that the e-liquid it designed, and was manufacturing and supplying was an inherently dangerous and toxic product which could cause the personal injuries as described herein.

94.     Occupational safety protections pursuant to OSHA and state laws were needed to ensure that ALTERNATIVE and MOTHER MURPHY'S employees were protected from the fumes from these flavoring additives, nicotine and other chemicals; the very chemicals designed to be vaporized and then inhaled by consumers.

95.     Despite the knowledge of the inhalation risks, MOTHER MURPHY'S and ALTERNATIVE, manufactured e-liquids and placed the products into the stream of commerce for millions of people, including Plaintiff, LUMPKINS, to inhale without warning of any risks caused by inhalation of the ingredients contained therein.

96.     Due to the continued blockbuster success and increased demand for JUUL Products, as well as anticipated global expansion, JUUL entered into an agreement with the Maryland based corporations Defendant TTI and Defendant ELIQUITECH in or around 2017 wherein TTI and ELIQUITECH also manufactured and supplied flavoring additives and blended the flavored e-liquids in JUUL Products. Upon information and belief, TTI and ELIQUITECH

21

FILED DATE: 9/10/2021 8:29 PM   2021L009092

continue to design, manufacture and supply flavoring additives and flavored e-liquids in conjunction with JUUL for use in its JUUL Products presently.

97.     In addition to MOTHER MURPHY'S and ALTERNATIVE, Defendants TTI and ELIQUITECH, based upon contractual relations with JUUL in California, also used specifications created by JUUL in San Francisco, and designed, manufactured and supplied flavoring ingredients and blended the JUUL e-liquids utilizing flavoring additives, which were never tested for safety risks associated with inhalation in e-cigarettes. TTI and ELIQUITECH placed JUUL e-liquids into the stream of commerce with the full knowledge that it was unsafe for use in the manner for which it was intended. TTI and ELIQUITECH knew, or should have known, that the e-liquid it was designing, manufacturing, and supplying in conjunction with JUUL was an inherently dangerous and a toxic product which could cause the personal injuries as described herein.

98.     Neither TTI or ELIQUITECH had ever tested the products for safety risks associated with utilizing the material in e-liquids. In fact, TTI and ELIQUITECH were fully aware that the Safety Data Sheets prepared for each flavoring additive specifically stated that the ingredient carried inhalation health risks. Despite the knowledge of the inhalation risks, TTI and ELIQUITECH manufactured e-liquids utilizing these ingredients and placed the product into the stream of commerce for millions of people, including Plaintiff, LUMPKINS, to inhale without warning of any risks caused by inhaling of the ingredients contained therein.

99.     The flavoring additives and raw ingredients manufactured and supplied by the ELIQUID MANUFACTURER DEFENDANTS and used in the JUUL e-liquid formulations as designed in conjunction with JUUL are associated with severe and significant risks of acute and chronic lung injuries, cardiovascular injuries and seizures. The E-LIQUID MANUFACTURER DEFENDANTS knew, or should have known of the risks and failed to warn Plaintiff,

FILED DATE: 9/10/2021 8:29 PM  2021L009092

LUMPKINS, and failed to ensure that its' contractual partner/customer JUUL warned its consumers of the risks, in reckless disregard for human safety.

100.    The aforementioned E-LIQUID MANUFACTURER DEFENDANTS were all manufacturers and suppliers of flavoring ingredients for JUUL E-liquids utilizing flavoring additives. The ELIQUID MANUFACTURER DEFENDANTS were negligent in that they failed to warn and failed to ensure its contractual partner JUUL warned the consumers and users of the risks associated with inhaling their products contained in the JUUL e-liquid and thereby acted in reckless disregard for the safety of the public, consumer and users of JUUL including millions of teenagers, young and older adults. The E-LIQUID MANUFACTURERS were otherwise negligent and liable for the injuries sustained by Plaintiff, LUMPKINS.

101.    Having created a product designed to hook users to its nicotine, JUUL had to mislead consumers into believing JUUL Products were something other than what it actually was. So, the company engaged in a years' long campaign to downplay JUUL's nicotine content, nicotine delivery, and the unprecedented risks of abuse and addiction JUUL Products pose. Defendants devised and knowingly carried out a material scheme to defraud consumers by (a) misrepresenting the nicotine content, nicotine delivery profile, and risks of JUUL Products, (b) representing to the public that JUUL's e-cigarette was a smoking cessation tool, and (c) using third-party groups to spread false and misleading narratives about e-cigarettes, and JUUL's e-cigarette in particular.

102.    Defendant, JUUL also utilized cigarette industry advertisements as a blueprint for JUUL's advertising campaigns. Which Monsees indicated was "quite useful to them."[30]

---

[30] Jackler et al., *JUUL Advertising Over its First Three Years on the Market*, Stanford Research into the Impact of Tobacco Advertising, Stanford University School of Medicine (Jan 31, 2019), http://tobacco.stanford.edu/tobacco_main/ publications/JUUL_Marketing_Stanford.pdf (as of July 5, 2019).

FILED DATE: 9/10/2021 8:29 PM    2021L009092

103.    As a result of its marketing campaigns, Defendant, JUUL has become the dominant e-cigarette manufacturer in the United States. Its revenues grew by 700% in 2017. According to a recent Wells-Fargo report, Defendant, JUUL, owns three-quarters (3/4) of the e-cigarette market.[31]

104.    All leading health authorities support three major conclusions of a 1988 report by the Surgeon General of the United State regarding nicotine and tobacco: (1) cigarettes and other forms of tobacco are addictive; (2) nicotine is the drug in tobacco that causes addiction; (3) the physiological and behavioral processes that determine tobacco addiction are similar to those that determine heroin and cocaine addiction.

105.    Nicotine fosters addiction through the brain's "reward" pathway. A stimulant and a relaxant, nicotine affects the central nervous system; increases in blood pressure, pulse, and metabolic rate; constricts blood vessels of the heart and skin, and causes muscle relaxation. When nicotine is inhaled it enters the bloodstream through membranes in the mouth and upper respiratory tract and through the lungs. Once nicotine in the bloodstream reaches the brain, it binds to receptors, triggering a series of physiologic effects in the user that are perceived as a "buzz" that includes pleasure, happiness, arousal, and relaxation of stress and anxiety. These effects are caused by the release of dopamine, acetylcholine, epinephrine, norepinephrine, vasopressin, serotonin, and beta endorphin. With regular nicotine use, however, these feelings diminish and the user must consume increasing amounts of nicotine to achieve the same pleasurable effects.[32]

106.    The neurological changes caused by nicotine create addiction. Repeated exposure to nicotine causes neurons in the brain to adapt to the action of the drug and return brain function

---

[31] Durbin et al., *Letter from United States Senators to Kevin Burns CEO JUUL Labs Inc.* (Apr 8, 2019), www.durbin.senate.gov/imo/media/doc/ FINAL%20JUUL%20Letter%204.8.19.pdf (as of July 5, 2019).

[32] Neal L. Benowitz, *Pharmacology of Nicotine: Addiction, Smoking-Induced Disease, and Therapeutics* (Sep 27, 2009) Annu Rev Pharmacol Toxicol 49: 57–71 www.ncbi.nlm.nih.gov/pmc/articles/PMC2946180/ (as of July 5th, 2019).

to normal. This process, called neuroadaptation, leads to the development of tolerance in which a given level of nicotine begins to have less of an effect on the user.[33]

107.    Once a brain is addicted to nicotine, the absence of nicotine causes compulsive drug-seeking behavior, which, if not satisfied, results in withdrawal symptoms including anxiety, tension, depression, irritability, difficulty in concentrating, disorientation, increased eating, restlessness, headaches, sweating, insomnia, heart palpitations and tremors, and intense cravings for nicotine. Though smokers commonly report pleasure and reduced anger, tension, depression and stress after smoking a cigarette, many of these effects are actually due to the relief of unpleasant withdrawal symptoms that occur when a person stops smoking and deprives the brain and body of nicotine. Studies have found that most smokers do not like smoking most of the time but do so to avoid withdrawal symptoms.[34]

108.    Nicotine is associated with cardiovascular, reproductive, and immunosuppressive problems, and is also a carcinogen.[35] Nicotine adversely affects the heart, eyes, reproductive system, lungs, and kidneys. It is well-established that nicotine increases blood pressure. Exposure to nicotine from sources such as nicotine gum still produces an increased risk of coronary vascular disease ("CVD") by producing acute myocardial ischemia, as well as an increased risk of peripheral arterial disorders. Aside from its use as a stimulant, the only other known use of nicotine is as an insecticide.[36]

---

[33] *Id.*

[34] Rigotti, *Strategies to help a smoker who is struggling to quit* (Oct 17, 2012) JAMA 308 (15): 1573–1580, www.ncbi.nlm.nih.gov/pmc/articles/PMC4562427/ (as of July 5, 2019); Paolini & De Biasi, Mechanistic insights into nicotine withdrawal (Oct. 15, 2011) Biochem Pharmacol 82(8): 996–1007, www.ncbi.nlm.nih.gov/pmc/articles/PMC3312005/ (as of July 5, 2019).

[35] Mishra et al., *Harmful Effects of Nicotine* (2015) Indian J. Med. Paediatr. Oncol., 36(1): 24–31 (Jan- Mar 2015), www.ncbi.nlm.nih.gov/pmc/articles/PMC4363846/ (as of July 5, 2019).

[36] *Id.*

FILED DATE: 9/10/2021 8:29 PM   2021L009092

109.    According to the National Institute of Health, the "amount and speed of nicotine delivery...plays a critical role in the potential for abuse of tobacco products."[37] The cigarette industry has long known that "nicotine is the addicting agent in cigarettes"[38] and that "nicotine satisfaction is the dominant desire" of nicotine addicts.[39]

110.    As a result, cigarette companies manipulated nicotine in order to foster and maintain addiction in their customers. For example, R.J. Reynolds Tobacco Company ("RJR") developed and patented nicotine salt additives such as nicotine benzoate to increase nicotine delivery in cigarette smoke. As detailed in an RJR memorandum titled "Cigarette concept to assure RJR a larger segment of the youth market," manipulating the pH of nicotine was expected to give cigarettes an additional nicotine 'kick'."[40] This kick was attributed to increased nicotine absorption associated with lower pH.[41]

111.    JUUL knowingly used the RJR research and conclusions to produce a similar nicotine kick, and thereby promoting increased use and sales of JUUL Products. In U.S. patent No. 9,215,895 (the "895 Patent"), assigned to Pax Labs, Inc. and listing Defendant, Bowen, as an inventor, JUUL describes a process for combining benzoic acids with nicotine to produce nicotine salts, a formulation that mimics the nicotine salt additive developed by RJR decades earlier.

---

[37] How Tobacco Smoke Causes Disease: The Biology and Behavioral Basis for Smoking-Attributable Disease: A Report of the Surgeon General, Chapter 4, Nicotine Addiction: Past and Present (2010), www.ncbi.nlm.nih.gov/books/NBK53017/ (as of July 5th, 2019).

[38] Brown & Williamson official A.J. Mellman, (1983) Tobacco Industry Quotes on Nicotine Addiction; www.ok.gov/okswat/documents/Tobacco%20Industry%20Quotes%20on%20Nicotine%20Addiction.pdf (as of July 5, 2019).

[39] *Id.*, R.J. Reynolds Tobacco Co. marketing memo, 1972.

[40] *Id.*, 1973 R.J. Reynolds Tobacco Co. memo titled, "Cigarette concept to assure RJR a larger segment of the youth market."

[41] *Benowitz et al.*, Nicotine Chemistry, Metabolism, Kinetics and Biomarkers, Nicotine Psychopharmacology (Oct. 13, 2010), Handb Exp Pharmacol 192:29–60, www.ncbi.nlm.nih.gov/pmc/articles/PMC2953858/ (as of July 5, 2019).

FILED DATE: 9/10/2021 8:29 PM    2021L009092

FILED DATE: 9/10/2021 8:29 PM 2021L009092

112.    In 2015 during an interview, Ari Atkins, a JUUL research & development engineer and one of the inventors of the JUUL e-cigarette device said that that, "In the tobacco plant, there are these organic acids that naturally occur. And they help stabilize the nicotine in such a way that makes it…" He pauses. "I've got to choose the words carefully here: Appropriate for inhalation."[42]

113.    JUUL Products were designed to deliver very little "throat hit" while delivering high concentrations of nicotine, higher than cigarettes or other electronic nicotine delivery systems containing freebase nicotine.

114.    Blood plasma studies in the 895 Patent[43] show that vaping nicotine benzoate increase nicotine delivery compared to cigarettes or vaporized solutions of freebase nicotine. In fact, nicotine uptake was up to four times higher for nicotine salt formulations than traditional cigarettes. JUUL's data indicates that nicotine salt solutions produce a higher heart rate in a shorter amount of time (a 50 beats/minute increase within 2 minutes for nicotine salt, versus a 40 beats/minute increase in 2.5 minutes for a Pall Mall cigarette). Nicotine slats also cause a faster and more significant rise in heart rate than placebo or vaporized freebase nicotine.

115.    The 895 Patent shows that a 4% solution of benzoic acid nicotine salt causes a peak nicotine-blood concentration ("Cmax") of approximately 15 ng/mL compared to a Cmax of 11 ng/mL for a Pall Mall cigarette.[44]

116.    One study found that the reported nicotine dose in JUULpods is likely lower than the actual dose. The strongest benzoic acid concentration mentioned in the 895 Patent is 4% (40 mg/mL of benzoic acid), one study tested four flavors of JUULpods and found a 4.5% benzoic

---

[42] Pierce, This Might Just Be The First Great E-Cig (Apr 21, 2015) WIRED, www.wired.com/2015/04/pax-juul-ecig/ (as of July 5, 2019).
[43] See U.S. Patent No. 9, 215, 895.
[44] '895 Patent, at col. 26, ll. 33-50.

FILED DATE: 9/10/2021 8:29 PM  2021L009092

acid solution.[45] That study found that JUULpods contained a concentration of 6.2% nicotine salt (about 60 mg/Ml), rather than the 5% nicotine (about 50 mg/mL) advertised. JUULpods containing an absolute nicotine concentration 1.2% higher than the stated 5% on the label (a relative increase of over 20%) coupled with more benzoic acid than listed in the 895 Patent produce higher nicotine absorption than expected for the advertised formulation.

117.    Other studies have reported even high actual concentrations of nicotine in JUULpods. Some experts estimate that JUULpods deliver the same nicotine as two packs of cigarettes.[46]

118.    In any event, JUUL Products are delivering doses of nicotine that are materially higher than that which is delivered by combustible cigarettes. A paper published by the European Union citing to the United Kingdom Medicines and Healthcare Products Regulatory Agency notes, "an e-cigarette with a concentration of 20 mg/mL delivers approximately 1 milligram of nicotine in 5 minutes (the time needed to smoke a traditional cigarette, for which the maximum allowable delivery is 1 mg of nicotine)."[47] With at least 59 mg/mL of nicotine delivered in a salt form that increases the rate and efficiency of uptake (and even with a lower mg/mL amount), a JUULpod will easily exceed the nicotine dose of a traditional cigarette. Thus, the European Union has banned all e-cigarette products with a nicotine concentration of more than 20 mg/mL nicotine, and Israel is likely to do the same.[48] As Israel's Deputy Health Minister has noted, "a product that contains a concentration of nicotine that is almost three times the level permitted in the European Union

---

[45] *Pankow et al.*, Benzene formation in electronic cigarettes (Mar 8, 2017) PLoS One. 2017; 12(3): e0173055 www.ncbi.nlm.nih.gov/pmc/articles/PMC5342216/ (as of July 5, 2019).

[46] *6 important facts about JUUL, Truth Initiative*, https://truthinitiative.org/researchresources/ emerging-tobacco-products/6-important-facts-about-juul (as of July 5, 2019)

[47] "E-Cigarettes" https://ec.europa.eu/health//sites/health/files/tobacco/docs/fs_ecigarettes_en.pdf (as of July 5, 2019) (citing United Kingdom Medicines and Healthcare Products Regulatory Agency and industry reports).

[48] Belluz, Juul, the Vape Device Teens are Getting Hooked On, Explained (Dec 20, 2018) Vox https://www.vox.com/science-and-health/2018/5/1/17286638/juul-vaping-e-cigarette (as of July 5, 2019).

constitutes a danger to public health and justifies immediate and authoritative steps to prevent it from entering the Israeli market."[49]

119.    Comparison of available data regarding per puff nicotine intake corroborates the other JUUL studies (mentioned above), indicating that JUUL delivers about 30% more nicotine per puff. Specifically, a recent study of JUULpods found that "[t]he nicotine levels delivered by JUUL Products are similar or even higher than those delivered by cigarettes."[50] The Reilly study tested JUUL's tobacco, crème brulee, fruit punch, and mint flavors and found that a puff of JUUL delivered $164 \pm 41$ micrograms of nicotine per puff. By comparison, a 2014 study using larger 100 mL puffs found that a Marlboro cigarette delivered 152 to 193 µg/puff.[51] Correcting to account for the different puff sizes between the Reilly and Schroeder studies, this suggest that, at 75 mL/puff, a Marlboro would deliver between 114 and 144 µg/puff, thus a JUUL puff delivers up to 36% more nicotine per puff than a Marlboro.

120.    "Nicotine yield is strongly correlated with tobacco consumption,"[52] A JUULpod with more nicotine will strongly correlate with higher rates of consumption of JUULpods, generating more revenue for JUUL. For example, a historic cigarette industry study looking at smoker employees found that "the number of cigarettes the employees smoked per day was directly correlated to the nicotine levels."[53] In other words, the more nicotine in the cigarettes, the more cigarettes a person smoked.

---

[49] Linder-Ganz, JUUL Warns It Will Fight Israel Over Its Potential Ban on E-Cigarettes (Jan 30, 2018), HAARETZ, www.haaretz.com/israel-news/business/juul-warns-it-will-fight-israel-overpotential-ban-on-its-e-cigarettes-1.6140058 (as of July 5, 2019).
[50] Reilly et al., Free Radical, Carbonyl, and Nicotine Levels Produced by JUUL Electronic Cigarettes (Oct 20, 2018) Nicotine Tob Res. 3 (the "Reilly study") https://www.ncbi.nlm.nih.gov/pubmed/30346584 (as of July 5, 2019).
[51] Schroeder & Hoffman, Electronic Cigarettes and Nicotine Clinical Pharmacology (May 2014) Tobacco Control 2014: 23:ii30-ii35, www.ncbi.nlm.nih.gov/pmc/articles/PMC3995273/ (as of July 5, 2019).
[52] Jarvis et al., Nicotine Yield From Machine Smoked Cigarettes and Nicotine Intakes in Smokers: Evidence From a Representative Population Survey (Jan 2001), JNCI Vol. 93, Issue 2, 134–138 https://academic.oup.com/jnci/article/93/2/134/2906355 (as of July 6, 2019).
[53] UCSF Library, 1003285443-5443 (US 85421).

FILED DATE: 9/10/2021 8:29 PM 2021L009092

121.    Despite the overwhelming date mentioned above, the JUUL DEFENDANTS, the E-LIQUID MANUFACTURING DEFENDANTS, and/or the DISTRIBUTOR DEFENDANTS have failed to disclose to consumers that JUUL Products' nicotine salt formulation delivers an exceptionally potent dose of nicotine.

122.    By delivering such potent doses of nicotine, JUUL Products magnify the health risks posed by nicotine, significantly increase the risk of cerebellar infection and brain injury.

123.    Further, because JUUL's nicotine salts actually increase the rate and magnitude of blood plasma nicotine compared to traditional cigarettes, the risk of nicotine addiction and abuse is higher for JUUL e-cigarettes than traditional cigarettes – a fact not disclosed by the JUUL DEFENDANTS, the E-LIQUID MANUFACTURING DEFENDANTS, and/or the DISTRIBUTOR DEFENDANTS.

124.    At the same time, as discussed above, the "throat hit" from nicotine salts is much lower than that for combustible tobacco products, making it easier to inhale. According to researchers, the "high total nicotine level (addictive delivery)" of a JUUL coupled with its easily inhalable nicotine vapor is "likely to be particularly problematic for public health."[54]

125.    The powerful combination of a highly addictive and easy to inhale e-cigarette, repeatedly exposes users to the toxic chemicals in the vapor, compounding the health risks to users, as described above.

126.    In addition to the nicotine content, the "Cool" Mint pods pose additional risks. The FDA's Tobacco Products Scientific Advisory Committee in March 2011 issued a report on menthol cigarettes, concluding that the minty additive was not just a flavoring agent but had drug-

---

[54] See Duell et al., Free-Base Nicotine Determination in Electronic Cigarette Liquids by 1H NMR Spectroscopy (Jun 18, 2018) 31 Chem. Res. Toxicol. 431-434, www.ncbi.nlm.nih.gov/pmc/articles/PMC6008736/ (as of July 5th, 2019).

FILED DATE: 9/10/2021 8:29 PM 2021L009092

like effects, including "cooling and anesthetic effects that reduce the harshness of cigarette smoke."[55] Mint could also "facilitate and deeper and more prolonged inhalation," resulting in greater smoke intake per cigarette."[56]

127. The JUUL DEFENDANTS, the E-LIQUID MANUFACTURING DEFENDANTS, and/or the DISTRIBUTOR DEFENDANTS fraudulently concealed material information about the addictive and dangerous nature of JUUL Products. the JUUL DEFENDANTS, the E-LIQUID MANUFACTURING DEFENDANTS, and/or the DISTRIBUTOR DEFENDANTS were necessarily in possession of all of this information.

128. The JUUL . DEFENDANTS, the E-LIQUID MANUFACTURING DEFENDANTS, and/or the DISTRIBUTOR DEFENDANTS engaged consultants, academics, reporters and other friendly sources such as the American Enterprise Institute to serve as spokespersons and cheerleaders for e-cigarette products. Taking yet another page from the cigarette-industry playbook, these influences masked their connection to the e-cigarette industry, while serving as its mouthpiece to cast doubt about risks and overstate benefits.

129. For example, when JUUL first launched its e-cigarette, cigarette company expert witness Sally Satel published an article in Forbes Magazine touting the benefits of nicotine – claiming it aids in concentration – and stating that it is harmless.[57] In another article, she lauded efforts by JUUL and others to develop nicotine-related products, and cast any doubters as hysterical and creating a "panic."[58]

---

[55] Proctor, Golden Holocaust: Origins of the Cigarette Catastrophe and the Case for Abolition, 500 (1st ed. 2011).
[56] *Id.* at 500-501.
[57] Satel, *Nicotine Itself Isn't The Real Villain* (Jun 19, 2015), Forbes, www.forbes.com/sites/sallysatel/2015/06/19/nicotine-can-save-lives/#60379f766f43 (as of July 5, 2019).
[58] Satel, *Why The Panic Over JUUL And Teen Vaping May Have Deadly Results* (Apr 11, 2018), Forbes, www.forbes.com/sites/sallysatel/2018/04/11/why-the-panic-over-juul-and-teen-vapingmay-have-deadly-results/#6b1ec693ea48 (as of July 5, 2019).

FILED DATE: 9/10/2021 8:29 PM 2021L009092

130. Numerous other articles, videos, and podcasts – also spread through social media–echoed this same message that the public health community was overreacting to the e-cigarettes and in a panic about nothing.

131. During each of its multiple fundraising rounds, JUUL assured potential investors that addiction to something that is not harmful is not harmful, suggesting that JUUL was no more harmful than coffee.

132. On information and belief, the JUUL DEFENDANTS, the E-LIQUID MANUFACTURING DEFENDANTS, and/or the DISTRIBUTOR DEFENDANTS spread this message trough hired third-party spokespersons and influencers.

133. Furthering their campaign of doubt and confusion, when asked directly about health risks, JUUL' employees and founders would point reporters to other sources to indicate that the JUUL Products had been shown to be safe, or not harmful, rather than admit what it knew regarding the dangers.

134. The JUUL DEFENDANTS, the E-LIQUID MANUFACTURING DEFENDANTS, and/or the DISTRIBUTOR DEFENDANTS well-understood from the cigarette industry playbook that sowing doubt and confusion over the benefits and risks of e-cigarettes is key to long-term success. First, by creating a "two-sides-to-every-story" narrative, JUUL gave addicted users permission to keep using the product and avoid the pain of withdrawal. Second, by engaging people who looked like independent experts, the JUUL DEFENDANTS, the E-LIQUID MANUFACTURING DEFENDANTS, and/or the DISTRIBUTOR DEFENDANTS staved off regulation and suppressed political opposition, allowing it a long runway to capture market share. Third, by belittling the public health community, the JUUL DEFENDANTS, the E-LIQUID

32

MANUFACTURING DEFENDANTS, and/or the DISTRIBUTOR DEFENDANTS neutered its most vocal threat.

135.    Upon information and belief, the JUUL DEFENDANTS, the E-LIQUID MANUFACTURING DEFENDANTS, and/or the DISTRIBUTOR DEFENDANTS conspired amongst themselves and/or with others in the cigarette industry to fraudulently conceal the risks of e-cigarettes, recognizing that a campaign of doubt, misinformation and confusion would benefit all of them and would be the key to the industry's survival.

136.    From JUUL's pre-release announcements to this day, the JUUL DEFENDANTS, the E-LIQUID MANUFACTURING DEFENDANTS, and/or the DISTRIBUTOR DEFENDANTS have continuously falsely represented that each pod contains only as much nicotine as a pack of cigarettes. The JUUL DEFENDANTS, the E-LIQUID MANUFACTURING DEFENDANTS, and/or the DISTRIBUTOR DEFENDANTS repeat these claims widely in advertisements, press releases, on JUUL Product packaging, and on JUUL's website. For example, some JUUL advertisements and JUUL's website provided that each JUUL Product is designed to contain approximately 0.7mL with 5% nicotine by weight which is approximately equivalent to 1 pack of cigarettes or 200 puffs."

137.    This statement is false and seriously misleading because, as JUUL knows, it is not just the amount of nicotine, but the efficiency with which the product delivers nicotine into the bloodstream, that determines the product's narcotic effect, risk of addiction, and other health risks.

138.    JUUL and the MANAGEMENT directed and approved the content of the JUUL website, and they also directed and approved the distribution channels for JUUL Product and their deceptive, misleading and fraudulent statements regarding JUUL's Products nicotine content. And

33

FILED DATE: 9/10/2021 8:29 PM    2021L009092

although they knew that these statements, were untrue, JUUL and Management have made no effort to retract such statements or correct their lies.

139.    ALTRIA greatly expanded the reach of this fraud by providing its retail and distribution might for JUUL products, causing millions of JUUL Products sold and distributed with packaging stating that JUUL Products contain only 5% nicotine by weight and are "approximately equivalent to about 1 pack of cigarettes."[59] JUUL, Management, and ALTRIA knew that these statements are false and misleading, but nevertheless utilized JUUL Product packing, marketing and advertising to maintain their fraud.

140.    ALTRIA knew in 2017 that a JUUL Product delivered more nicotine than one pack of cigarettes. In 2017, ALTRIA launched its MarkTen Bold ENDS, a relatively high-strength 4% formulation compared to the 2.5% and 3.5% strength MarkTen products initially offered. Even though JLI was already on store shelves and was rapidly gaining market share with its 5% nicotine formulation, ALTRIA chose to bring a less potent 4% formulation to market.

141.    According to ALTRIAS' own pharmacokinetic testing as reflected in the below chart, this 4% less potent formulation was nevertheless sufficient to raise plasma nicotine to levels approaching those generated by combustible cigarettes. In other words, ALTRIAS' own pharmacokinetic testing suggested the highly addictive nature of a 5% formulation, as such a formulation would readily equal or exceed the nicotine delivery profile of a combustible cigarette.

142.    Based on its own internal knowledge, ALTRIA knew that a 5% nicotine formulation would carry more nicotine than one pack of cigarettes. In addition to data it received from JLI, the ALTRIA DEFENDANTS' due diligence undoubtedly included a careful

---

[59] Juul Labs, Feb. 14, 2018, 10:35 a.m. Tweet, https://twitter.com/JUULvapor/status/963844069519773698.

34

FILED DATE: 9/10/2021 8:29 PM    2021L009092

examination of JLI's intellectual property, including the 895 patent, which provides a detailed overview of nicotine benzoate's pharmacokinetic profile.

143.    Thus, JUUL, Management, and ALTRIA knew that the statement on JUUL Product packaging that each JUUL Product contains 5% nicotine and about as much nicotine as a pack of cigarettes is literally false and they intended such statements to mislead. Neither ALTRIA, nor JUUL or Management has made any effort to correct or retract the false and misleading statements as to the true nicotine content in JUUL Product. Instead, they have continued to misrepresent the product's nicotine content and design, with the goal of misleading and deceiving consumers.

144.    Not only have JUUL, Management and ALTRIA misrepresented or concealed the actual amount of nicotine consumed via JUUL Product, but they also did not effectively or fully inform users about the risks associated with the potent dose of nicotine delivered by its products. Despite making numerous revisions to JUUL Product packaging since 2015, the packaging did not include nicotine addiction warnings until JUUL was forced to add them in August 2018.

145.    The    JUUL    DEFENDANTS,    the    E-LIQUID    MANUFACTURING DEFENDANTS, and/or the DISTRIBUTOR DEFENDANTS knew or should have known that benzoic acid affects pH and "absorption of nicotine across biological membranes."[60]

146.    Assuming a concentration of 59 mg/mL, JUUL's reported nicotine content corresponds to about 40 mg of nicotine per 0.7 mL JUULpod. If, as JUUL claims, this is equivalent to one pack of cigarettes (or 20 cigarettes), that implies 2 mg of nicotine per cigarette.

147.    JUUL's equivalency claim further assumes 10 puffs per cigarette (or 200 puffs per pack), which is 0.2 mg (200 μg) of nicotine per puff.

---

[60] Benowitz et al., Nicotine Chemistry, Metabolism, Kinetics and Biomarkers, Nicotine Psychopharmacology (Oct 12, 2010), Handb Exp Pharmacol 192: 29–60 www.ncbi.nlm.nih.gov/pmc/articles/PMC2953858/ (as of July 5, 2019).

148. Typically, a cigarette that delivers around one milligram of nicotine in smoke retains "about 14-20 milligrams of nicotine in the unsmoked rod," *USA v. Philip Morris*, Inc. (D.D.C. 2006) 449 F.Supp.2d 1, 567, for an overall delivery of 5-7% of the cigarette's actual nicotine content. A study by the Center for Disease Control found that in "commercial cigarette brands, nicotine concentrations ranged from 16.2 to 26.3 mg nicotine/g tobacco (meaning 19.2 mg/g; meidan 19.4 mg/g)."[61] assuming an average of 19 milligrams of nicotine per cigarette, an average pack of cigarettes contains 380 milligrams of nicotine, or six times as much nicotine as the 62 milligrams reported for each JUULpods. Yet the average pack would be expected to deliver only 5-7% (19-27 mg) of its nicotine content to the user. In line with this expectation, a study of thousands of smokers found smokers intaking between 1.07 to 1.39 milligrams per cigarette (21.4-27.8 mg per pack).[62] This is less than half of the amount of nicotine contained in a JUULpod (i.e. 2 mg per cigarette based on JUUL's stated concentration, or 200 µg per puff assuming 100% delivery). Even with the slightly lower efficiency of delivery demonstrated in studied like Reilly (about 82%, for average of 164 µg per puff), this amounts to a substantially higher amount of nicotine than a human will absorb from a JUULpod than from smoking a pack of cigarettes.

149. JUUL's statement in its advertisements that each JUUL Product contains about as much nicotine as a pack of cigarettes is therefore literally false and likely to mislead, because the amount of nicotine contained in the JUUL Product is perhaps six time less than in a pack of cigarettes, but the actual amount of nicotine consumed via a JUUL Product is as much as twice as

---

[61] Lawler et al., Surveillance of Nicotine and pH in Cigarette and Cigar Filler(Apr 1, 2018), Tob Regul Sci. 3(Suppl 1): 101–116, www.ncbi.nlm.nih.gov/pmc/articles/PMC5628511/ (as of July 5 2019).
[62] Jarvis et al., Nicotine Yield From Machine-Smoked Cigarettes and Nicotine Intakes in Smokers: Evidence From a Representative Population Survey (Jan 17, 2001), JNCI, Vol. 93, 2:134–138, www.ncbi.nlm.nih.gov/pubmed/11208883 (as of July 5 2019).

high as that via cigarettes. This fact was never mentioned by the JUUL DEFENDANTS, the E-LIQUID MANUFACTURING DEFENDANTS, and/or the DISTRIBUTOR DEFENDANTS.

150.    Further, while a pack of cigarettes contains 20 cigarettes which each have to be separately lit, the JUUL Products can be inhaled continuously, and often can be used indoors without detection by others, a feature that JUUL promoted heavily in its advertisements, eliminating the need for smoking breaks. Thus, the device design leads users to intake far more nicotine than would occur with cigarettes.

151.    Finally, the JUUL device does not have a manual or automatic off switch. On information and belief, neither the JUUL Products nor the programming of the JUUL device's temperature or puff duration settings limit the amount of nicotine JUUL delivers each puff to the upper bound of a cigarette. Thus, in contrast to a traditional cigarette, which self-extinguishes as each cigarette is consumed, the JUUL device allows non-stop nicotine consumption which is limited only by the device's battery. As a result, the JUUL device is able to facilitate consumption of extraordinarily high levels of nicotine that a cigarette cannot match. This makes it easier for the user to become addicted and poses additional health risks.

152.    Contrary to the JUUL DEFENDANTS, the E-LIQUID MANUFACTURING DEFENDANTS, and/or the DISTRIBUTOR DEFENDANTS' representations, the above data indicate that each JUUL Product delivers significantly more nicotine than a pack of cigarettes, both per pack and per puff. JUUL's products thus have the foreseeable effect of exacerbating nicotine addiction and the adverse health effects associated with nicotine consumption.

153.    JUUL, ALTRIA, and Management recognized that one of the keys to growing and preserving the number of nicotine-addicted e-cigarette users (and thus, JUUL's staggering market share), was to mislead potential customers about the true nature of JUUL products. Defendants

FILED DATE: 9/10/2021 8:29 PM    2021L009092

knew that if it became public that JUUL Products were designed as a way to introduce nicotine to youth and otherwise hook new users with its potent nicotine content and delivery, it would not survive the public and regulatory backlash. Therefore, JUUL (with the knowledge and support of Management) and ALTRIA repeatedly made false and misleading statements to the public that JUUL Products were created and designed as a smoking cessation device, and falsely and misleadingly used the mails and wires to spread the subterfuge. JUUL, Management, and ALTRIA committed these deceptive, misleading and fraudulent acts intentionally and knowingly. In making these representations, JUUL, Management, and ALTRIA intended that consumers, the public, and regulators rely on misrepresentations that JUUL Products were designed to assist smoking cessation.

154.    The most blatant evidence of the cover-up scheme was the January 2019, $10 million "Make the Switch" television advertising campaign. This campaign, which was the continuation of JUUL's web-based Switch campaign, was announced less than a month after ALTRIA announced its investment in JUUL.

155.    The "Make the Switch" television ads featured former smokers aged 37 to 54 discussing "how JUUL helped them quit smoking."[63] According to JUUL's Vice President of Marketing, the "Make the Switch" campaign was "an honest, straight down the middle of the fairway, very clear communication about what we're trying to do as a company."[64] These statements were false as JUUL e-cigarettes were not intended to be a smoking cessation device. JUUL, and ALTRIA committed acts of deceit and fraud when they caused the "Make the Switch" campaign to air on television with the fraudulent intent of deceiving and misleading the public, the

---

[63] Angelica LaVito, JLI combats criticism with new TV ad campaign featuring adult smokers who quit after switching to e-cigarettes, CNBC (Jan. 8, 2019), https://www.cnbc.com/2019/01/07/juul-highlights-smokers-switching-to-e-cigarettes-in-adcampaign.html.
[64] Id.

FILED DATE: 9/10/2021 8:29 PM 2021L009092

United States Congress, and government regulators into believing that the company is and had been focused solely on targeting adult smokers. ALTRIA also committed acts of deceit and fraud when they caused tens of thousands, if not millions, of written versions of the Make the Switch campaign to be distributed with packages of its combustible cigarettes.

156.    JUUL Products have been framed as smoking cessation devices in their public statements on their and website. Monsees explained during his testimony before Congress:

> "The history of cessations products have extremely low efficacy. That is the problem we are trying to solve here. So, if we can give consumers an alternative and market it right next to other cigarettes, then we can actually make something work. [T]raditional nicotine replacement therapies, which are generally regarded as the gold standard for tools, right, for quitting, those are nicotine in a patch or a gum form, typically, and the efficacy rates on those hover just below about a 10 percent or so. JUUL-we ran a very large study of JUUL consumers, ex-smokers who had picked up JUUL, and looked at them, looked at their usage on a longitudinal basis, which is usually the way that we want to look at this, in a sophisticated fashion ... what we found was that after 90 days, 54 percent of those smokers had stopped smoking completely, for a minimum of 30 days already. And the most interesting part of this study is that if you follow it out further, to 180 days, that number continues to go up dramatically, and that is quite the opposite of what happens with traditional nicotine replacement therapies."[65]

157.    In response to a direct question about whether people buy JUUL to stop smoking, Monsees candidly responded: "Yes. I would say nearly everyone uses our product as an alternative to traditional tobacco products."[66]

158.    Other illustrative and non-exhaustive examples include the following:

**Statements by Defendant JUUL:**

---

[65] 5 Testimony of JAMES Monsees, Co-founder and Chief Product Officer, JUUL Labs, Inc., Subcommittee on Economic and Consumer Policy, Committee on Oversight and Reform, Hearing on Examining JUUL 's Role in the Youth Nicotine Epidemic: Part 2 (July 25, 2019), https://oversight.house.gov/legislation/hearings/examining-juul-s-role-in-the-youth-nicotineepidemic-part-ii
[66] *Id.*

FILED DATE: 9/10/2021 8:29 PM   2021L009092

159.   "JUUL Labs was founded by former smokers, James and Adam, with the goal of improving the lives of the world's one billion adult smokers by eliminating cigarettes. We envision a world where fewer adults use cigarettes, and where adults who smoke cigarettes have the tools to reduce or eliminate their consumption entirely, should they so desire." (JLI Website, April 2018 (or earlier));[67]

160.   "JUUL Labs, which exists to help adult smokers switch off of combustible cigarettes." (JLI Website, September 19, 2019); and,[68]

161.   "To paraphrase Commissioner Gottlieb, we want to be the offramp for adult smokers to switch from cigarettes, not an on-ramp for America's youth to initiate on nicotine." (JLI Website, November 13, 2018);[69]

**Statements by ALTARIA:**

162.   "We are taking significant action to prepare for a future where adult smokers overwhelmingly choose non-combustible products over cigarettes by investing $12.8 billion in JUUL, a world leader in switching adult smokers . . . . We have long said that providing adult smokers with superior, satisfying products with the potential to reduce harm is the best way to achieve tobacco harm reduction." (ALTRIA Website, December 20, 2018);[70] and,

163.   We believe e-vapor products present an important opportunity to adult smokers to switch from combustible cigarettes." (Letter to FDA Commissioner Gottlieb, 10/25/18).[71]

---

[67] Our Mission, JUUL LABS (2019), https://www.juul.com/mission-values (last visited February 7, 2020).
[68] CONSUMER UPDATE: 9/19, JUUL Labs, Inc (Sept. 19, 2019), https://newsroom.juul.com/consumer-update-9-19/.
[69] JLI Labs Action Plan, JUUL Labs, Inc. (Nov. 13, 2018), https://newsroom.juul.com/juullabs-action-plan/ (statement of then-CEO Kevin Burns).
[70] ALTRIA Makes $12.8 Billion Minority Investment in JUUL to Accelerate Harm Reduction and Drive Growth, BUSINESSWIRE (Dec. 20, 2018, 7:00 AM EST), https://www.businesswire.com/news/home/20181220005318/en/ALTRIA-12.8-BillionMinority-Investment-JUUL-Accelerate.
[71] Letter from Howard A. Willard III, ALTRIA, to Dr. Scott Gottlieb, FDA, 2 (October 25, 2018).

FILED DATE: 9/10/2021 8:29 PM   2021L009092

164. "We have long said that providing adult smokers with superior, satisfying products with the potential to reduce harm is the best way to achieve tobacco harm reduction. Through Juul, we are making the biggest investment in our history toward that goal." (ALTRIA Earning Call, December 20, 2018)

165. "Through JUUL, we have found a unique opportunity to not only participate meaningfully in the e-vapor category but to also support and even accelerate transition to noncombustible alternative products by adult smokers." (ALTRIA Earning Call, January 31, 2019);

166. We expect the JUUL product features that have driven JUUL's success in switching adult smokers in the U.S. to strongly appeal to international adult cigarette smokers. (ALTRIA Earning Call, January 31, 2019).

167. The JUUL DEFENDANTS, the E-LIQUID MANUFACTURING DEFENDANTS, and/or the DISTRIBUTOR DEFENDANTS knew at the time of making these statements that they were false, deceptive and misleading. JUUL e-cigarettes do not have FDA approval as a cessation product.

168. The JUUL DEFENDANTS, the E-LIQUID MANUFACTURING DEFENDANTS, and/or the DISTRIBUTOR DEFENDANTS' tacit message in their Switch advertisements is switch because, unlike cigarettes, JUUL Products are harmless to your health.

169. The JUUL DEFENDANTS, the E-LIQUID MANUFACTURING DEFENDANTS, and/or the DISTRIBUTOR DEFENDANTS' false, deceptive and misleading Switch campaign suggests that smoking and JUULing are mutually exclusive and that purchasing a JUUL Product will "switch" a smoker to a non-smoker.

FILED DATE: 9/10/2021 8:29 PM    2021L009092

170.    the JUUL DEFENDANTS, the E-LIQUID MANUFACTURING DEFENDANTS, and/or the DISTRIBUTOR DEFENDANTS knew that a large number of smokers who use JUUL products do not end up switching but end up consuming cigarettes and JUUL Products.

171.    JUUL has advertised cost-savings calculators as part of its Switch campaign. Those calculators assume that a smoker who switches will continue consuming the same amount of nicotine that he or she did as a smoker (i.e., a pack a day smoker is presumed to consume one JUULpod a day). the JUUL DEFENDANTS, the E-LIQUID MANUFACTURING DEFENDANTS, and/or the DISTRIBUTOR DEFENDANTS knew that the calculator is misleading because smokers who switch to JUUL Products typically increase their nicotine intake or end up consuming cigarettes and JUUL Products, rendering the calculator misleading at best.

172.    the JUUL DEFENDANTS, the E-LIQUID MANUFACTURING DEFENDANTS, and/or the DISTRIBUTOR DEFENDANTS ensured that JUUL Products were the opposite of a "tool[] to reduce or eliminate" nicotine consumption. According to the National Institutes of Health, the "amount and speed of nicotine delivery . . . plays a critical role in the potential for abuse of tobacco products."[72] As described above, JUUL and Bowen designed the JUUL Products to deliver nicotine in larger amounts and at a faster rate than even cigarettes, and then knowingly misled the public about those facts.

173.    In late 2019, and in response to the House of Representatives hearings in which JUUL Executives testified, the FDA issued two warning letters to JUUL detailing its concern that

---

[72] CDC et al., Nicotine Addiction: Past and Present, How Tobacco Smoke Causes Disease (2010), https://www.ncbi.nlm.nih.gov/books/NBK53018/#ch4.s92.

FILED DATE: 9/10/2021 8:29 PM 2021L009092

JUUL was unlawfully marketing its e-cigarette products as cessation tools or as "modified risk tobacco products" within the meaning of the FDCA.[73]

174.    Through the false and deceptive viral marketing campaign, described above, the JUUL DEFENDANTS had built a successful product, largely on the back of improperly marketing to youth and by creating a false impression that that JUUL Products were "safer" than cigarettes.

175.    After achieving early success, the JUUL DEFENDANTS knew that to take its profits to the next level and dramatically expand the market for JUUL Products, it needed to access a broader distribution channel, namely marketing and selling its products in the thousands of chain convenience stores throughout the United States. Indeed, a single contract to market and sell through a convenience store chain could result in JUUL Products being sold in thousands of stores to millions of customers.

176.    Not only had the JUUL DEFENDANTS emulated the cigarette industry in its marketing, but they also sought to recreate the cigarette industry's distribution machine to push that marketing to a far wider swath of consumers than JUUL itself could reach. That distribution machine included the major retail convenience stores ("Chain Convenience Stores"). It also included the cigarette industry distributors who had been the powerful middlemen between the cigarette industry and the Chain Convenience Stores in the cigarette market for decades.

177.    While the cigarette industry distributors largely operated behind the scenes of cigarette manufacturing giants like PHILLIP MORRIS (ALTRIA) and R.J. Reynolds, they too are giants in the cigarette industry who have played a significant role in the decades of massive cigarette sales in America.

---

[73] 5U.S. Food and Drug Administration Warning Letter to JUUL Labs, (September 9, 2019), https://www.fda.gov/inspections-compliance-enforcement-and-criminal-investigations/warningletters/juul-labs-inc-590950-09092019.

FILED DATE: 9/10/2021 8:29 PM    2021L009092

178.    For example, the cigarette industry Distributor Defendant MCLANE is a wholly owned subsidiary of Berkshire Hathaway[74] with an annual revenue of approximately $50 billion.[75] MCLANE provides wholesale distribution services in all 50 states to customers that include convenience stores, discount retailers, wholesale clubs, drug stores, military bases, quick service restaurants and casual dining restaurants. MCLANE maintains a dominant market share within the convenience store industry and serves most of the national convenience store chains, providing products to approximately 50,000 retail locations nationwide.[76] MCLANE has served as one of the largest tobacco distributors in the United States for the cigarette industry giants such as ALTRIA and R.J. Reynolds.[77] [78] MCLANE is the largest wholesale distributor for ALTRIA, accounting for approximately 27%, 26% and 25% of ALTRIAS' consolidated net revenues for the years ended December 31, 2018, 2017 and 2016, respectively.

179.    Similarly, CORE-MARK is one of the largest wholesale distributors to the convenience retail industry in North America, providing sales, marketing, distribution and logistics services to approximately 43,000 customer locations across the United States ("U.S.") and Canada.503 CORE-MARK posted an annual revenue of over $16 billion in 2018.[79]

180.    EBY BROWN is the largest privately-owned tobacco, candy and convenience store distributor in the United States. The company services over 14,500 convenience stores around the United States, including the Speedway convenience store chain.

---

[74] https://www.mclaneco.com/content/mclaneco/en/home.html
[75] https://www.berkshirehathaway.com/2018ar/2018ar.pdf
[76] Berkshire Hathaway 10-K at K-18.
[77] "The largest customer of PM USA, USSTC, Middleton and Nat Sherman, MCLANE COMPANY, Inc., accounted for approximately 27%, 26% and 25% of ALTRIA's consolidated net revenues for the years ended December 31, 2018, 2017 and 2016, respectively." http://www.snl.com/Cache/c396883765.html.
[78] Reynolds America, 2016 Inc. 10-K, https://seekingalpha.com/filing/2987262.
[79] CORE-MARK 2018 10-K, at 3.

FILED DATE: 9/10/2021 8:29 PM    2021L009092

181.     The DISTRIBUTOR DEFENDANTS were necessary partners to elevate the JUUL market and ensure that the JUUL DEFENDANTS false and deceptive marketing campaign had a wide reach. Indeed, from years of partnering with the cigarette industry and their existing relationships with the Chain Convenience Stores, the cigarette industry distributors already had the existing infrastructure to widely push JUUL products to a massive audience serviced by their existing customers.

182.     Not only were the cigarette industry's distributors valuable to JUUL DEFENDANTS but JUUL Products were valuable to the DISTIBUTOR DEENDANTS.

183.     By the time JUUL launched its e-cigarette in 2015, cigarette consumption had been steadily declining for over a decade. Based on data compiled from the U.S. Department of Agriculture - Economic Research Service and provided by the Tobacco Merchants Association ("TMA"), total cigarette consumption in the U.S. declined from 351 billion cigarettes in 2008 to 249 billion cigarettes in 2017, or a compounded annual decline of approximately 3.4%.[80] An entire industry including the cigarette industry distributors had depended on lucrative cigarette sales for decades

184.     The entire cigarette industry was hurting. Indeed, as announced in COREMARK's 2018 Annual Report, a slow-down in tobacco sales was affecting the major tobacco distributors' bottom line.[81]

185.     Capitalizing on the void left by a slow-down in cigarette sales, JUUL approached the cigarette industry distributors, including MCLANE, CORE-MARK and EBY BROWN, and

---

[80] CORE-MARK 10-K at 2.
[81] CORE-MARK 2018 10-K at 1 ("The rate of growth in our net sales was lower than what we experienced the last several years due primarily to an acceleration of the decline of cigarette carton sales as well as fewer significant retail chains bidding their business in 2018.").

convinced them that one of the ways to plug their financial hole was to join JUUL in growing the e-cigarette market.

186.    This could be accomplished by plugging the JUUL Products into the cigarette industry marketing and distribution model that had been so successful for decades.

187.    The proposal was attractive to the cigarette industry distributors as they could use JUUL to assuage investors that the void created by declining cigarette sales could be filled. For example, in 2018, CORE-MARK assured investors that "a greater decline in total cigarette consumption has been partially offset by consumption of alternative nicotine products and [OTHER TOBACCO PRODUCTS (OTP)]."[82] CORE-MARK detailed how selling e-cigarettes would fill a financial void for the company for years to come stating that "[a]lthough we anticipate overall cigarette consumption will continue to decline, we expect to offset these declines through continued growth in our non-cigarette categories including alternative nicotine products and OTP, market share expansion and incremental gross profit from cigarette manufacturer price increases."[83]

188.    Plugging the hole left by declining cigarette sales and reaping the profits attainable through JUUL Product margins were only possible, however, if the cigarette industry distributors were able to activate their distribution juggernaut to convince their Chain Convenience Store trade partners to widely market and sell JUUL Products. In short, the entire supply chain had to commit to the deceptive marketing and sales campaign that JUUL had started.

189.    Starting in 2016, each of the cigarette industry distributors, including DISTIBUTOR DEENDANTS committed to joining with JUUL DEFENDANTS to elevate the JUUL Product market. That was accomplished by JUUL DEFENDANTS and the Cigarette

---

[82] CORE-MARK 10-K at 4.
[83] *Id.*

46

FILED DATE: 9/10/2021 8:29 PM    2021L009092

Industry Distributors by pushing JUUL DEFENDANTS' dangerous products which were designed for and aimed at youth to its Chain Convenience Store partners, and through them to the ultimate customers. It was accomplished by ensuring that JUUL DEFENDANTS' false deceptive and dangerous marketing campaign was pushed to the Chain Convenience Stores and from there to a wide swath of convenience store customers across the United States.

190.    Indeed, the cigarette industry distributors, including the DISTIBUTOR DEENDANTS, became an essential piece of the supply chain to push products to millions of customers around the United States.

191.    Even though the cigarette industry distributors knew that the JUUL Products contained nicotine, from at least 2016 to 2018, the DISTRIBUTOR DEFENDANTS, the RETAILER DEFENDANTS, the JUUL DEFENDANTS worked to sell JUUL Products that neither disclosed the products' nicotine content, nor any of its risks.

192.    The use of e-cigarettes, including JUUL Products, cause significant lung toxicity[84] and have been implicated in multiple severe pathological lung injuries.

193.    Recent studies have demonstrated that exposure to JUUL aerosol induces oxidative stress, inflammation, epithelial barrier dysfunction, and DNA damage in lung cells.[85]

194.    Lung epithelial cells are the first-line of defense and provide barrier protection from toxic inhalants. Epithelial barrier dysfunction can allow toxic inhalants access to systemic circulation by which they can interact with other tissues to generate fibrosis and encourage infection. In addition, the impaired barrier function allows greater passage of inhaled chemicals

---

[84] Lauren F. Chun et al., Pulmonary Toxicity of E-cigarettes, 313 Am. J. Physio. Lung Cell Mol. Physiol L193 (May 18, 2017), https://www.ncbi.nlm.nih.gov/pubmed/28522559.
[85] 1 Thivanka Muthumalage, et al., E-cigarette Flavored Pods Induce Inflammation, Epithelial Barrier Dysfunction, and DNA Damage in Lung Epithelial Cells and Monocytes, 9 Scientific Reports 19035 (2019), https://www.nature.com/articles/s41598-019-51643-6.

into the body, increasing inflammation both locally in the lungs and systemically. This can lead to acute and chronic lung injury as well as exposure to, and increased susceptibility to, infections in users of e-cigarettes, including JUUL Products.[86] [87]

195.    Research has also demonstrated that ultrafine metal particles from heating devices have been found in e-cigarette aerosol, and in e-cigarette user's lungs.[88]

196.    In addition, exposure to JUUL aerosol has shown to significantly impair endothelial function comparable to impairment of endothelial function caused by use of combustible cigarettes.[89]

197.    It is well-established that endothelial dysfunction and injury from direct toxic effects of inhalants such as cigarette smoke, cause lung injuries such as chronic obstructive pulmonary disease (COPD), emphysema, asthma and chronic bronchitis.[90]

198.    Recent epidemiological and toxicological studies detected links between asthma frequency and e-cigarette use in adolescents and reported that vaporized e-liquids containing the same flavor aldehydes found in JUUL induce inflammation in human respiratory epithelia.[91]

199.    In 2015, Moore et al., published a case report describing bilateral pneumonia and pleural effusions associated with e-cigarette use.[92]

---

[86] Laura E. Crotty Alexander et al. Chronic Inhalation of E-cigarette Vapor Containing Nicotine Disrupts Airway Barrier Function and Induces Systemic Inflammation and Multiorgan Fibrosis in Mice, 314 Am. J. Physiol. Regul. Comp. Physiol. R834 (2018), https://journals.physiology.org/doi/full/10.1152/ajpregu.00270.2017.

[87] Pieter S. Hiemstra et al., The Innate Immune Function of Airway Epithelial Cells in Inflammatory Lung Disease, 45 Eur. Respir. J. 1150 (2015), https://erj.ersjournals.com/content/45/4/1150.

[88] Alessandra Caporale et al., Acute Effects of Electronic Cigarette Aerosol Inhalation on Vascular Function Detected at Quantitative MRI, 293 Radiology 97 (2019), https://www.ncbi.nlm.nih.gov/pubmed/31429679.

[89] Poonam Rao et al., Juul and Combusted Cigarettes Comparably Impair Endothelial Function, 6 Tob. Regul. Sci. 30 (2020), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC6953758/.

[90] Francesca Polverino et al. COPD as an Endothelial Disorder: Endothelial Injury Linking Lesions in the Lungs and Other Organs? 8 Pulm. Circ. 2045894018758528 (2018), https://www.ncbi.nlm.nih.gov/pubmed/29468936.

[91] Phillip W. Clapp and Ilona Jaspers, Electronic Cigarettes: Their Constituents and Potential Links to Asthma, 79 Curr Allergy Asthma Rep. 17 (2017), https://www.ncbi.nlm.nih.gov/pubmed/28983782.

[92] Kendall Moore et al., Bilateral Pneumonia and Pleural Effusions Subsequent to Electronic Cigarette Use, 3 Open Journal of Emergency Medicine 18 (2015).

200.    In short, older adults, especially those who were smokers are at increased risk of lung and other complications due to their baseline higher risk status, making them more vulnerable to the adverse health effects of vaping. Accordingly, as quoted by AARP, Brian King, Deputy Director for Research Translation of the Office on Smoking and Health at the Centers for Disease Control and Prevention (CDC) stated, "Everyone, including older adults, should refrain from using all e-cigarettes and vape products."[93]

201.    It has been established that the use of e-cigarettes, including JUUL, can lead to acute and chronic lung injuries such as EVALI, infection, lipoid pneumonia, organizing pneumonia, chemical pneumonitis, alveolar hemorrhage, bronchiolitis obliterans (popcorn lung), pneumothorax, acute respiratory failure, acute respiratory distress syndrome (ARDS), asthma, emphysema and COPD. Defendants never warned the public of the risk of serious acute and chronic lung injuries that were associated with the use of e-cigarettes, including JUUL. In fact, JLI downplayed any risk associated with the inhalation of JUUL aerosol and continued to overtly promote JUUL as safe.

202.    It is notable, however, that in August 2019, JLI CEO Kevin Burns admitted that the long-term health effects of JUUL are unknown.[94] The failure to properly and adequately test the safety of JUUL Products prior to marketing them to the public, and continuing in the face of the onslaught of publications in the medical literature demonstrating an association with e-cigarette use and significant lung injuries, and infection, amounts to a reckless disregard for public safety.

---

[93] Sari Harrar, Vaping Dangers for Older Adults: What to know about recent lung illnesses and deaths, AARP (Oct. 17, 2019), https://www.aarp.org/health/conditions-treatments/info2019/vaping-e-cigarettes-illnesses-deaths.html

[94] CBS Interview JLI CEO, Kevin Burns (August 29, 2019).

FILED DATE: 9/10/2021 8:29 PM    2021L009092

FILED DATE: 9/10/2021 8:29 PM    2021L009092

**Michael Lumpkins Events Leading to Injury**

203.    In and/or after 2017, Plaintiff, LUMPKINS, was exposed to the JUUL DEFENDANTS, the E-LIQUID MANUFACTURING DEFENDANTS, and/or the DISTRIBUTOR DEFENDANTS' advertising and promotional efforts via many sources.

204.    Beginning in or around 2018, Plaintiff, LUMPKINS, switched to e-cigarettes as an alternative to smoking.

205.    In and/or around 2018, Plaintiff, LUMPKINS, purchased his first JUUL e-cigarettes after being misled that it is a safe alternative form of nicotine.

206.    Between 2018, and September, 2019, Plaintiff, LUMPKINS, used and purchased JUUL Products many times, including, but not limited to flavored JUUL Products that were: manufactured, designed, and/or distributed by the JUUL DEFENDANTS, THE E-LIQUID DEFENDANTS; and distributed by the DISTRIBUTOR DEFENDANTS.

207.    In August 2019, Plaintiff LUMPKINS presented to Defendant, PALOS and was diagnosed with pneumonia. He was then given antibiotics and a prescription for antibiotics to treat his pneumonia.

208.    In August 2019 and prior to September 10, 2021, Plaintiff, LUMPKINS, received treatment and evaluation for his pneumonia from actual agents, apparent agents, and/or employees of Defendant, PALOS.

209.    On or prior to September 10, 2019, Plaintiff, LUMPKINS experienced head ache, slurred speech, nausea, vomiting, facial droop, speech delay, and/or cognitive abnormality.

210.    On or about September 10, 2019, Plaintiff, LUMPKINS, presented to Defendant, PALOS for examination, treatment and medical services.

FILED DATE: 9/10/2021 8:29 PM    2021L009092

211. On or about September 10, 2019, and at all times material, Defendant, PALOS, presented itself as a health-care institution qualified and equipped to render medical, surgical, and other health-care related services individually as an institution and through its agents, and/or employees, including without limit, HALPERN, VAN BEEK, and/or others.

212. On or about September 10, 2019, and at all times material, PALOS employed agents, and/or employees including, without limit, medical providers physicians, nurses, therapists, HALPERN, and/or VANBEEK, and/or others.

213. On or about September 10, 2019, and at all times material, agents, and/or employees including, without limit, medical providers physicians, nurses, therapists, HALPERN, and/or VANBEEK, and/or others, acted at all times material in the course and scope of their employment with PALOS.

214. On or about September 10, 2019, and at all times material, PALOS, individually and by and through the actions and/or omissions of its actual agents, apparent agents, and/or employees including, without limit, medical providers physicians, nurses, therapists, and/or others, HALPERN, and/or VANBEEK, and/or others, and/or each of them, provided certain examinations, medical care, treatment and/or services to Plaintiff, LUMPKINS.

215. On or about September 10, 2019, Plaintiff, LUMPKINS, received certain care, treatment and evaluation at and/or by Defendant, PALOS, individually, and/or by and through the actions and/or omissions of its actual agents, apparent agents, and/or employees, medical providers, physicians, nurses, therapists, including without limit, HALPERN, VAN BEEK, and/or others, and each of them.

FILED DATE: 9/10/2021 8:29 PM    2021L009092

216.     On or about September 10, 2019, and at all times material, Defendant, HALPERN, was an actual agent, apparent agent, and/or employee of Defendant, PALOS, Defendant CEP ILLINOIS, and/or Defendant VITUITY.

217.     On or about September 10, 2019, and at all times material, Defendant, HALPERN, was an acting within the scope and course of his agency and/or employment relationship with Defendant, PALOS, Defendant CEP ILLINOIS, and/or Defendant VITUITY.

218.     On or about September 10, 2019, and at all times material, Defendant, VAN BEEK, was an actual agent, apparent agent, and/or employee of Defendant, PALOS, and/or Defendant, RADIOLOGY.

219.     On or about September 10, 2019, and at all times material, Defendant, VAN BEEK, was an acting within the scope and course of his agency and/or employment relationship with Defendant, PALOS, and/or Defendant, RADIOLOGY.

220.     On or about September 10, 2019, and at all times material, Defendant, PALOS, individually, and by and through the action and/or omissions of its actual agents, apparent agents, and/or employees, including without limit, HALPERN, VAN BEEK, and/or others, and each of them, had a duty to possess and apply the knowledge and exercise the care and skill of a reasonably well-qualified health care provider under the same or similar circumstances.

221.     On or about September 10, 2019, and at all times material, Plaintiff, LUMPKINS, is documented in the PALOS emergency department records to have presented to PALOS individually, and by and through the actions and/or omissions of its actual agents, apparent agents, and/or employees including, without limit, medical providers physicians, nurses, therapists, HALPERN, and/or VANBEEK, and/or others, and/or each of them with: complaints of a severe headache, vomiting, aphasia, slurred speech, right-sided weakness that began earlier in the day.

FILED DATE: 9/10/2021 8:29 PM   2021L009092

Neurological deficits were noted as were Plaintiff's symptoms of headache, nausea, multiple episodes of nonbloody nonbilious emesis. A history of pneumonia and an absence of evidence of cancer was document.

222.   On or about September 10, 2019, and at all times material, Defendant, PALOS, individually and by and through the actions and/or omissions of its actual agents, apparent agents, and/or employees including, without limit, medical providers physicians, nurses, therapists, HALPERN and/or others, ordered a head CT scan with the stated reason of headache.

223.   On or about September 10, 2019, and at all times material, Plaintiff, LUMPKINS, is documented in the PALOS emergency department records to have two (2) "lesions which appear to be metastatic cancer in the left frontal and left cerebellar area with edema and mass effect, as well as a midline shift of the frontal lesion", identified by a CT scan read by Defendant, VAN BEEK. He was also documented as having an elevated white blood cell count. That count was elevated despite the use of antibiotics.

224.   On or about September 10, 2019, and at all times material, PALOS, individually and by and through the actions and/or omissions of its actual agents, apparent agents, and/or employees including, without limit, medical providers physicians, nurses, therapists, and/or others, HALPERN, and/or VANBEEK, and/or others, and/or each of them, documented in the emergency room medical records that Plaintiff suffered from "brain metastases."

225.   On or about September 10, 2019, and at all times material, Plaintiff, LUMPKINS, was transferred to Advocate Christ Hospital for further treatment.

226.   On or about September 11, 2019, and at all times material, Plaintiff, LUMPKINS, is documented in the Advocate Christ Hospital medical records to have multiple masses and/or cystic lesions on the brain with mild hydrocephalus identified by an MRI exam.

FILED DATE: 9/10/2021 8:29 PM   2021L009092

227.    On or about September 11, 2019, and at all times material, Plaintiff, LUMPKINS, was diagnosed with a cerebellar infection. This infection required emergent antibiotic treatment and brain surgery.

228.    On or about September 11, 2019, and at all times material, Plaintiff, LUMPKINS, underwent brain surgery to treat the cerebellar abscesses and received further treatment for the infection at Advocate Christ Hospital from September 11 to October 30, 2019.

229.    After September 11, 2019, Plaintiff, LUMPKINS, was diagnosed with a catastrophic brain injury caused by a cerebellar infection.

230.    On or about October 30, 2019, Plaintiff, LUMPKINS was discharged to a skilled nursing facility for further care and treatment due to the catastrophic brain injury caused by the cerebellar infection.

231.    On or about October 30, 2019, and/or at all times material, Plaintiff, LUMPKINS was been rendered cognitively and physically disabled and incompetent. Plaintiff, LUMPKINS, did not discover (and could not discover) that his injuries were wrongfully caused until long after September 11, 2019.

232.    At no time before Plaintiff, LUMPKINS, suffered infection and catastrophic brain injury did the JUUL DEFENDANTS, the E-LIQUID MANUFACTURING DEFENDANTS, and/or the DISTRIBUTOR DEFENDANTS involved in the research, development, marketing, and distribution of JUUL Products provide any warnings about the risks of infection, promotion of infection and/or other brain injury.

233.    At no time before Plaintiff, LUMPKINS, suffered infection and catastrophic brain injury did the JUUL DEFENDANTS, the E-LIQUID MANUFACTURING DEFENDANTS,

FILED DATE: 9/10/2021 8:29 PM 2021L009092

and/or the DISTRIBUTOR DEFENDANTS warn Plaintiff, LUMPKINS that JUUL Products were unsafe for him, nor was he instructed on how much of the JUUL Products was safe to consume.

234. The JUUL DEFENDANTS, the E-LIQUID MANUFACTURING DEFENDANTS, and/or the DISTRIBUTOR DEFENDANTS misrepresented the nicotine content of JUUL Products by representing them as 5% strength. As discussed above, JUUL Products contain more than 5% nicotine by volume, and deliver it in a form that is particularly potent.

235. The JUUL DEFENDANTS, the E-LIQUID MANUFACTURING DEFENDANTS, and/or the DISTRIBUTOR DEFENDANTS marketed JUUL Products as a safe "alternative to cigarettes," thereby giving the false impression that they are not harmful like traditional cigarettes and safe to use.

236. Plaintiff, LUMPKINS did not and could not have known the risks associated with JUUL, because The JUUL DEFENDANTS, the E-LIQUID MANUFACTURING DEFENDANTS, and/or the DISTRIBUTOR DEFENDANTS had exclusive knowledge about the JUUL Products, including its designed, and concealed that information from him.

237. Instead, as a result of the JUUL DEFENDANTS, the E-LIQUID MANUFACTURING DEFENDANTS, and/or the DISTRIBUTOR DEFENDANTS' wildly successful campaign, based on tactics developed by the cigarette industry and amplified in social media, Plaintiff, LUMPKINS reasonably believed that JUUL Products were a safe, and harmless, cigarette alternative.

238. Plaintiff, LUMPKINS was unaware that the use of JUUL Products can cause cerebellar infection and brain injury. Had he known of the risks, he would not have started using JUUL Products.

FILED DATE: 9/10/2021 8:29 PM    2021L009092

**COUNT I**

(Strict Products Liability – the JUUL Defendants, the E-Liquid Manufacturing Defendants, and the Distributor Defendants)

1-238. Plaintiff realleges and incorporated by reference ¶1-238 stated fully herein.

239. The JUUL DEFENDANTS, the E-LIQUID MANUFACTURING DEFENDANTS, and the DISTRIBUTOR DEFENDANTS had a duty to warn Plaintiff, LUMPKINS of the risks and/or defects that were known and reasonably knowable with respect to the JUUL Products.

240. The JUUL DEFENDANTS, the E-LIQUID MANUFACTURING DEFENDANTS, and the DISTRIBUTOR DEFENDANTS never properly warned Plaintiff, LUMPKINS of these risks.

241. At all relevant times, the JUUL DEFENDANTS, the E-LIQUID MANUFACTURING DEFENDANTS, and the DISTRIBUTOR DEFENDANTS designed, manufactured, assembled, inspected, tested (or not), packaged, labeled, marketed, advertised, promoted, supplied, distributed, and/or sold the JUUL Products that Plaintiff, LUMPKINS consumed.

242. JUUL Products were designed and intended to be used as a method of ingesting nicotine and the other vaporized constituents of JUUL's e-liquid solution.

243. JUUL Products were sold in a defective condition that is unreasonably dangerous and unsafe to the consumer because the JUUL DEFENDANTS failed to adequately warn about the risk of nicotine addiction and entirely failed to warn of the risks of lung injuries, cerebellar infection and/or brain injury, among other harmful effects.

FILED DATE: 9/10/2021 8:29 PM   2021L009092

244. The JUUL DEFENDANTS effectively designed JUUL Products with a pharmacokinetic profile engineered to create risks of abuse and addiction (that exceeded that of a cigarette) in that JUUL Products delivered more nicotine than cigarettes.

245. JUUL Products do not perform as safely as a reasonable and ordinary consumer would reasonably assume and reasonably expect. JUUL Products contain and deliver more nicotine than is represented, are delivered by heat vaporization inhaled into the body, and contain and deliver other harmful products that injure multiple organ systems and are designed to cause nicotine addiction.

246. The risks inherent in the design of JUUL Products significantly outweigh any benefits of such design.

247. The JUUL DEFENDANTS, the E-LIQUID MANUFACTURING DEFENDANTS, and the DISTRIBUTOR DEFENDANTS could have utilized cost effective, reasonably feasible alternative designs to minimize these harms, such as by designing products that delivered less nicotine per puff, used less potent and addictive forms of nicotine (without reduction of the "throat hit"), reduced repeated exposure to toxic chemicals that do not pose substantial health risks to users while still delivering sufficient levels of nicotine to preexisting cigarette smokers.

248. The JUUL DEFENDANTS could have limited the duration of each puff to prevent the JUUL e-cigarette from delivering doses of nicotine far in excess of a cigarette on a per puff basis and could have designed the device to shut off for a period of time if excessive puffs were taken too close in time.

249. The JUUL DEFENDANTS, the E-LIQUID MANUFACTURING DEFENDANTS, and the DISTRIBUTOR DEFENDANTS failed to design the product with an

FILED DATE: 9/10/2021 8:29 PM   2021L009092

expiration or best if "used by" date, resulting in the potential for the products' chemical properties to change in a deleterious manner

250. Plaintiff, LUMPKINS used JUUL Products as intended or in reasonably foreseeable ways.

251. Plaintiff, LUMPKINS', injuries, physical, emotional and economic, were reasonably foreseeable to the JUUL DEFENDANTS, the E-LIQUID MANUFACTURING DEFENDANTS, and the DISTRIBUTOR DEFENDANTS at the time of the products' design, manufacture, distribution, and sale.

252. JUUL Products were defective and unreasonably dangerous when they left the JUUL DEFENDANTS, the E-LIQUID MANUFACTURING DEFENDANTS, and/or the DISTRIBUTOR DEFENDANTS' possession. The defects continued to exist through the products' sale to and use by consumers, including Plaintiff, LUMPKINS, who used the products without any substantial change in the products' condition.

253. At all times relevant, the JUUL Products, were also defective in one or more of the following respect:

   a. Delivering a dangerously high amount of nicotine per puff;

   b. Failing to warn consumers, including but not limited to Plaintiff, LUMPKINS, of the dangerously high doses of nicotine deliver per puff of the JUUL devices;

   c. Failing to warn consumers, including, but not limited to Plaintiff, LUMPKINS, of the dangers of repeated exposure to toxic chemics in the JUUL e-liquid aerosols;

   d. The amount of nicotine contained in a JUUL Product is as much as twice as high as that in a pack of cigarettes, and not as "approximately equivalent to a pack of cigarettes" as represented;

   e. JUUL Products cause, maintain, or aggravate infections and subject consumers to the risks of concomitant health hazards that addictive;

FILED DATE: 9/10/2021 8:29 PM 2021L009092

f. Failed to warn consumers, including, without limit, Plaintiff, LUMPKINS, that JUUL Products cause, maintain, or aggravate infections and subject consumers to the risks of concomitant health hazards that addictive;

g. JUUL Products cause harm by increased exposure to nicotine and other harmful, toxic ingredients as described herein in this complaint;

h. Failed to warn consumers, including, without limit, Plaintiff, LUMPKINS, JUUL Products cause harm by increased exposure to nicotine and other harmful, toxic ingredients as described herein in this complaint;

i. The representations about the actual nicotine content did not conform to the pharmacokinetics of JUUL device use and the products' cigarette equivalence;

j. Failed to warn consumers, including, but not limited to, Plaintiff, LUMPKINS, that JUUL PRODUCTS were unsafe for use

a. Was otherwise defective for use by consumers and the The JUUL DEFENDANTS, the E-LIQUID MANUFACTURING DEFENDANTS, and the DISTRIBUTOR DEFENDANTS had actual knowledge that the JUUL Products were defective and unreasonably dangerous for use by consumers, such as Plaintiff, LUMPKINS

254. Plaintiff, LUMPKINS, consumption of the JUUL Products as directed by The JUUL DEFENDANTS, the E-LIQUID MANUFACTURING DEFENDANTS, and the DISTRIBUTOR DEFENDANTS involved substantial dangers that Plaintiff, LUMPKINS, would develop or worsen infection and lead to brain injury. This substantial danger was not readily recognizable to an ordinary consumer, including, but not limited to Plaintiff, LUMPKINS.

255. Given the knowledge of The JUUL DEFENDANTS, the E-LIQUID MANUFACTURING DEFENDANTS, and the DISTRIBUTOR DEFENDANTS when they designed, manufactured, assembled, inspected, tested (or not), packaged, labeled, marketed, advertised, promoted, supplied, distributed, and/or sold the JUUL Products, and their knowledge before Plaintiff consumed JUUL Products, the JUUL DEFENDANTS, the E-LIQUID MANUFACTURING DEFENDANTS, and the DISTRIBUTOR DEFENDANTS failed to adequately warn of the dangers involved.

256. Due to the use of the JUUL Products, and as a direct and proximate result thereof, Plaintiff, LUMPKINS, was caused to develop a cerebellar infection, and/or use of the JUUL PRODUCTS substantially contributed to the cerebellar infection, which led to a catastrophic brain injury.

257. The JUUL DEFENDANTS, the E-LIQUID MANUFACTURING DEFENDANTS, and the DISTRIBUTOR DEFENDANTS are liable under a theory of strict product liability as set forth in the Restatement (Second) of Torts.

258. The JUUL Products in question reached the Plaintiff without any substantial change in the condition in which it was sold.

259. Plaintiff, LUMPKINS, seeks all damages to which she may be justly entitled, including, but not limited to, past and future medical expenses, wage losses, physical pain and mental anguish, disfigurement, emotional distress, loss of normal life, disability, and physical impairment.

WHEREFORE, Plaintiff, MICHAEL A. LUMPKINS, by and through his attorneys, SMITH LACIEN LLP, demands judgment against Defendants, JUUL LABS, INC., previously d/b/a as PAX LABS, INC. and PLOOM INC., individually, and by and through the actions and/or omissions of its actual agents, apparent agents and/or employees; ALTRIA GROUP, INC., individually, and by and through the actions and/or omissions of its actual agents, apparent agents, and/or employees; PHILIP MORRIS USA, INC., individually, and by and through the actions and/or omissions of its actual agents, apparent agents, and/or employees; ALTRIA CLIENT SERVICES LLC, individually, and by and through the actions and/or omissions of its actual agents, apparent agents, and/or employees; ALTRIA GROUP DISTRIBUTION COMPANY, individually, and by and through the actions and/or omissions of its actual agents, apparent agents,

FILED DATE: 9/10/2021 8:29 PM 2021L009092

and/or employees; ALTRIA ENTERPRISES LLC, individually, and by and through the actions and/or omissions of its actual agents, apparent agents, and/or employees;; MOTHER MURPHY'S LABS, INC., individually, and by and through the actions and/or omissions of its actual agents, apparent agents, and/or employees; ALTERNATIVE INGREDIENTS, INC., individually, and by and through the actions and/or omissions of its actual agents, apparent agents, and/or employees; TOBACCO TECHNOLOGY, INC. individually, and by and through the actions and/or omissions of its actual agents, apparent agents, and/or employees; ELIQUITECH, INC., individually, and by and through the actions and/or omissions of its actual agents, apparent agents, and/or employees; MCLANE COMPANY, INC., individually, and by and through the actions and/or omissions of its actual agents, apparent agents, and/or employees; EBY-BROWN COMPANY, LLC, individually, and by and through the actions and/or omissions of its actual agents, apparent agents, and/or employees; CORE-MARK HOLDING COMPANY, INC., individually, and by and through the actions and/or omissions of its actual agents, apparent agents, and/or employees; and/or WALGREENS CO., individually, and by and through the actions and/or omissions of its actual agents, apparent agents, and/or employees, and each of them, for such sum of money in excess of FIFTY THOUSAND DOLLARS ($50,000.00) as shall represent just and fair representation.

## COUNT II
(Negligence – the JUUL Defendants, the E-Liquid Manufacturing Defendants, and the Distributor Defendants)

1-238. Plaintiff realleges and incorporated by reference ¶1-238 stated fully herein.

239. At all relevant times, all the JUUL DEFENDANTS, the E-LIQUID MANUFACTURING DEFENDANTS, and the DISTRIBUTOR DEFENDANTS designed, manufactured, assembled, inspected, tested (or not), packaged, labeled, marketed, advertised,

FILED DATE: 9/10/2021 8:29 PM  2021L009092

promoted, supplied, distributed, and/or sold and/or otherwise placed the JUUL Products into the stream of commerce, and therefore owed a duty of reasonable care to avoid causing harm to those that consumed it such as Plaintiff, LUMPKINS.

240.    The JUUL Products were the types of products that could endanger others if negligently made or promoted.

241.    The    JUUL    DEFENDANTS,    the    E-LIQUID    MANUFACTURING DEFENDANTS, and the DISTRIBUTOR DEFENDANTS had a duty of reasonable care in designing, manufacturing, assembling, inspecting, testing, packaging, labeling, marketing, advertising, promoting, suppling, distributing and/or selling the JUUL Products to avoid causing harm to those that consumed them.

242.    The    JUUL    DEFENDANTS,    the    E-LIQUID    MANUFACTURING DEFENDANTS, and the DISTRIBUTOR DEFENDANTS knew, or should have known that the exercise of reasonable care, the risks to consumers of JUUL e-cigarettes, a powerfully addictive and dangerous nicotine-delivery device.

243.    The    JUUL    DEFENDANTS,    the    E-LIQUID    MANUFACTURING DEFENDANTS, and the DISTRIBUTOR DEFENDANTS knew or, by the exercise of reasonable care, should have known, ordinary consumers such as Plaintiff would not have realized the potential risks and dangers of JUUL Products. JUUL Products contain and deliver more nicotine than is represented, contain and deliver other harmful products that injure multiple organ systems, promote infection, and are designed to cause nicotine addiction.

244.    The    JUUL    DEFENDANTS,    the    E-LIQUID    MANUFACTURING DEFENDANTS, and the DISTRIBUTOR DEFENDANTS knew or, by the exercise of reasonable care, should have known, that JUUL Products posed risks including the risks of addiction, lung

FILED DATE: 9/10/2021 8:29 PM 2021L009092

injuries, infection, and/or brain injury, among other harmful effects, as described herein, that were known and knowable in light of scientific and medical knowledge that was generally accepted in the scientific community at the time of design, manufacture, distribution, and sale of JUUL Products.

245. The JUUL DEFENDANTS, the E-LIQUID MANUFACTURING DEFENDANTS, and the DISTRIBUTOR DEFENDANTS knew or should have known that JUUL Products needed to be researched, designed, manufactured, assembled, inspected, tested packaged, labeled, marketed, advertised, promoted, supplied, distributed, and/or sold properly, without defects and with due care to avoid needlessly causing harm.

246. The JUUL DEFENDANTS, the E-LIQUID MANUFACTURING DEFENDANTS, and the DISTRIBUTOR DEFENDANTS knew or should have known that adults who were encouraged to cease smoking by using JUUL Products as a cessation device were individuals with greater health risk factors who were at enhanced risk of harm by utilizing the misleadingly labeled JUUL Products which misrepresented the nicotine content and failed to warn of the other chemicals' content and risks.

247. The JUUL DEFENDANTS, the E-LIQUID MANUFACTURING DEFENDANTS, and the DISTRIBUTOR DEFENDANTS were negligent, reckless and careless and failed to take the care and duty owed to Plaintiff, thereby causing Plaintiff to suffer harm.

248. At the time the JUUL Products left the JUUL DEFENDANTS, the E-LIQUID MANUFACTURING DEFENDANTS, and the DISTRIBUTOR DEFENDANTS' control it was unreasonably dangerous, defective, and unreasonably safe because of one or more of the following:

      a. Failure to perform adequate testing of the JUUL Products prior to marketing to ensure safety, including long-term testing of the product, and testing for injury to the brain and cardiovascular systems, respiratory, pulmonary and immune

FILED DATE: 9/10/2021 8:29 PM 2021L009092

systems, and other related medical conditions, as well as its effect on mental health

b. Failure to warn consumers, including, but not limited to, Plaintiff, LUMPKINS that JUUL Products had not been adequately tested or researched prior to marketing to ensure safety;

c. Failure to take reasonable care in the design of JUUL Products;

d. Failure to use reasonable care in the production of JUUL Products;

e. Failure to use reasonable care in the manufacture of JUUL Products;

f. Failure to use reasonable care in the assembly of JUUL Products;

g. Failure of the DISTRIBUTOR DEFENDANTS to use reasonable care in supplying and distributing JUUL Products;

h. Failure to use reasonable care in advertising, promoting, and marketing JUUL Products;

i. Failure to use reasonable care in the sale of JUUL Products without adequate warnings;

j. Use of a design that maximizes nicotine delivery while minimizing "harshness," thereby easily creating and sustaining addiction;

k. Failure to utilize proper materials, ingredients, additives and components in the design of JUUL Products to ensure they would not deliver unsafe doses of nicotine and cause other injuries from inhalation of other hazardous chemicals as described in the complaint;

l. Failure to inspect JUUL Products for them to operate properly and avoid delivering unsafe levels of nicotine and causing the injuries described in the complaint;

m. Failure to reasonably and properly test and properly analyze the testing of JUUL Products under reasonably foreseeable circumstances;

n. Failure to warn consumers about the dangers associated with use of JUUL Products, in that it was unsafe, significantly increases risk of infection, and/or progression of infection, is powerfully addictive, can cause permanent brain injury, and impairment of thinking and cognition;

FILED DATE: 9/10/2021 8:29 PM   2021L009092

o.  Failure to warn consumers of negative health consequences associated with exposure to nicotine and other harmful and toxic ingredients contained with JUUL Products;

p.  Failure to warn consumers of the actual nicotine content, JUUL Products' cigarette equivalence and the pharmacokinetics of JUUL use;

q.  Misleadingly stating the amount of nicotine in JUUL Products is "approximately equivalent to a pack of cigarettes", when the amount of nicotine contained in a JUUL Products is as much as twice as high as that in a pack of cigarettes;

r.  Failure to provide any instructions regarding a safe amount of JUUL Products to consume in a day;

s.  Failure to take necessary steps to modify JUUL Products to avoid delivering high doses of nicotine and repeatedly exposing them to toxic chemicals;

t.  Failure to recall JUUL Products;

u.  Misleading consumers, including, but not limited to, Plaintiff, LUMPKINS, that JUUL Products are safe; and/or

v.  All other failures, acts and omissions set forth herein.

249.    As a direct and proximate result of the aforementioned acts and/or omissions of the JUUL DEFENDANTS, the E-LIQUID MANUFACTURING DEFENDANTS, and the DISTRIBUTOR DEFENDANTS, Plaintiff, LUMPKINS was injured, has endured and will in the future endure pain and suffering; has become disabled and disfigured; has suffered a loss of the enjoyment of a normal life; and has been damaged in his capacity to earn a living; and has incurred past and future medical expenses.

WHEREFORE, Plaintiff, MICHAEL A. LUMPKINS, by and through his attorneys, SMITH LACIEN LLP, demands judgment against Defendants, JUUL LABS, INC., previously d/b/a as PAX LABS, INC. and PLOOM INC., individually, and by and through the actions and/or omissions of its actual agents, apparent agents and/or employees; ALTRIA GROUP, INC.,

FILED DATE: 9/10/2021 8:29 PM   2021L009092

individually, and by and through the actions and/or omissions of its actual agents, apparent agents, and/or employees; PHILIP MORRIS USA, INC., individually, and by and through the actions and/or omissions of its actual agents, apparent agents, and/or employees; ALTRIA CLIENT SERVICES LLC, individually, and by and through the actions and/or omissions of its actual agents, apparent agents, and/or employees; ALTRIA GROUP DISTRIBUTION COMPANY, individually, and by and through the actions and/or omissions of its actual agents, apparent agents, and/or employees; ALTRIA  ENTERPRISES LLC, individually, and by and through the actions and/or omissions of its actual agents, apparent agents, and/or employees;; MOTHER MURPHY'S LABS, INC., individually, and by and through the actions and/or omissions of its actual agents, apparent agents, and/or employees; ALTERNATIVE INGREDIENTS, INC., individually, and by and through the actions and/or omissions of its actual agents, apparent agents, and/or employees; TOBACCO TECHNOLOGY, INC. individually,   and by and through the actions and/or omissions of its actual agents, apparent agents, and/or employees; ELIQUITECH, INC., individually, and by and through the actions and/or omissions of its actual agents, apparent agents, and/or employees; MCLANE COMPANY, INC., individually, and by and through the actions and/or omissions of its actual agents, apparent agents, and/or employees; EBY-BROWN COMPANY, LLC, individually, and by and through the actions and/or omissions of its actual agents, apparent agents, and/or employees; CORE-MARK HOLDING COMPANY, INC., individually, and by and through the actions and/or omissions of its actual agents, apparent agents, and/or employees; and/or WALGREENS CO., individually, and by and through the actions and/or omissions of its actual agents, apparent agents, and/or employees, and each of them, for such sum of money in excess of FIFTY THOUSAND DOLLARS ($50,000.00) as shall represent just and fair representation.

FILED DATE: 9/10/2021 8:29 PM 2021L009092

## COUNT III
(Medical Negligence – Palos Community Hospital d/b/a Palos Hospital d/b/a Northwestern Medicine Palos Hospital)

1-238. Plaintiff realleges and incorporated by reference ¶1-238 stated fully herein.

239.    On or about September 10, 2019, and at all times material, PALOS, individually and through its agents, and/or employees including, without limit, medical providers physicians, nurses, therapists and/or others, HALPERN, and/or VANBEEK, and/or others, and each of them, had a duty to possess and apply the knowledge and exercise the care and skill of a reasonably well-qualified health care provider under the same or similar circumstances.

240.    At all times material, PALOS, individually, and by and through the actions and/or omissions of its actual agents, apparent agents, and/or employees, including without limit, HALPERN, VAN BEEK, and/or others, and each of them, were negligent in one or more of the ways:

  a.  Failing to timely diagnose and treat Plaintiff, LUMPKINS;

  b.  Failing to the significance of Plaintiff, LUMPKINS, signs, symptoms, and/or complaints;

  c.  Failing to fully communicate Plaintiff, LUMPKINS, signs, symptoms, and/or complaints to others;

  d.  Delaying treatment for Plaintiff, LUMPKINS, infection and brain injury; and/or

  e.  Was otherwise negligent.

241.    As a direct and proximate result of the aforementioned acts and/or omissions of , PALOS, individually, and by and through the actions and/or omissions of its actual agents, apparent agents, and/or employees, including without limit, HALPERN, VAN BEEK, and/or others, and each of them, Plaintiff, LUMPKINS, was injured, has endured and will in the future endure pain and suffering; has become disabled and disfigured; has suffered a loss of the

FILED DATE: 9/10/2021 8:29 PM    2021L009092

enjoyment of a normal life; and has been damaged in his capacity to earn a living; and has incurred past and future medical expenses.

242.    Pursuant to Illinois Code of Civil Procedure, section 2-622, the Affidavit of Attorney for Plaintiff is attached hereto as Exhibit A.

243.    Pursuant to Illinois Code of Civil Procedure, section 2-622, reports of health care professionals are attached hereto as Exhibit B

244.    The damages sought in this cause of action exceed the jurisdictional limit of the Circuit court of Cook County's Law Division. See Affidavit of Plaintiff's counsel regarding damages sought in this action attached as Exhibit C.

WHEREFORE, Plaintiff, MICHAEL A. LUMPKINS, by and through his attorneys, SMITH LACIEN LLP, demands judgment against Defendant, PALOS COMMUNITY HOSPITAL d/b/a PALOS HOSPITAL d/b/a NORTHWESTERN MEDICINE PALOS HOSPITAL, individually, and by and through the actions and/or omissions of its actual agents, apparent agents, and/or employees, including without limit, LEIGH A. HALPERN, M.D., DARREN B. VAN BEEK, M.D., and each of them, for such sum of money in excess of FIFTY THOUSAND DOLLARS ($50,000.00) as shall represent just and fair representation.

### COUNT IV
(Medical Negligence – Leigh A. Halpern, M.D.)

1-238. Plaintiff realleges and incorporated by reference ¶1-238 stated fully herein.

239.    On or about September 10, 2019, and at all times material,  HALPERN, individually, and as actual agents, apparent agents, and/or employees of PALOS, CEP ILLINOIS, and/or VITUITY, and each of them, had a duty to possess and apply the knowledge and exercise the care and skill of a reasonably well-qualified health care provider under the same or similar circumstances

240.    At all times material, HALPERN, individually, and as actual agents, apparent agents, and/or employees of PALOS, CEP ILLINOIS, and/or VITUITY, was negligent in one or more of the ways:

a.   Failing to timely diagnose and treat Plaintiff, LUMPKINS;

b.   Failing to the significance of Plaintiff, LUMPKINS, signs, symptoms, and/or complaints;

c.   Failing to fully communicate Plaintiff, LUMPKINS, signs, symptoms, and/or complaints to others;

d.   Delaying treatment for Plaintiff, LUMPKINS, infection and brain injury; and/or

e.   Was otherwise negligent.

241.    As a direct and proximate result of the aforementioned acts and/or omissions of , HALPERN, individually, and as actual agents, apparent agents, and/or employees of PALOS, CEP ILLINOIS, and/or VITUITY, Plaintiff, LUMPKINS, was injured, has endured and will in the future endure pain and suffering; has become disabled and disfigured; has suffered a loss of the enjoyment of a normal life; and has been damaged in his capacity to earn a living; and has incurred past and future medical expenses.

242.    Pursuant to Illinois Code of Civil Procedure, section 2-622, the Affidavit of Attorney for Plaintiff is attached hereto as Exhibit A.

243.    Pursuant to Illinois Code of Civil Procedure, section 2-622, reports of health care professionals are attached hereto as Exhibit B

244.    The damages sought in this cause of action exceed the jurisdictional limit of the Circuit court of Cook County's Law Division. See Affidavit of Plaintiff's counsel regarding damages sought in this action attached as Exhibit C.

69

FILED DATE: 9/10/2021 8:29 PM 2021L009092

WHEREFORE, Plaintiff, MICHAEL A. LUMPKINS, by and through his attorneys, SMITH LACIEN LLP, demands judgment against Defendant, LEIGH A. HALPERN, M.D., DARREN B. VAN BEEK, M.D.,; LEIGH A. HALPERN, M.D., individually, and as actual agent, apparent agent, and/or employee of PALOS COMMUNITY HOSPITAL d/b/a PALOS HOSPITAL d/b/a NORTHWESTERN MEDICINE PALOS HOSPITAL, CEP AMERICA-ILLINOIS, LLP, and/or CEP AMERICA LLC d/b/a VITUITY, and each of them, for such sum of money in excess of FIFTY THOUSAND DOLLARS ($50,000.00) as shall represent just and fair representation.

## COUNT V
### (Medical Negligence – CEP America-Illinois, LLP)

1-238. Plaintiff realleges and incorporated by reference ¶1-238 stated fully herein.

239.    On or about September 10, 2019, and at all times material,  CEP AMERICA, individually, and by and through the actions and/or omissions of its actual agents, apparent agents, and/or employees, including without limit, HALPERN, and/or others, and each of them, had a duty to possess and apply the knowledge and exercise the care and skill of a reasonably well-qualified health care provider under the same or similar circumstances

240.    At all times material, CEP AMERICA, individually, and by and through the actions and/or omissions of its actual agents, apparent agents, and/or employees, including without limit, HALPERN, and/or others, and each of them, was negligent in one or more of the ways:

    a.  Failing to timely diagnose and treat Plaintiff, LUMPKINS;

    b.  Failing to the significance of Plaintiff, LUMPKINS, signs, symptoms, and/or complaints;

    c.  Failing to fully communicate Plaintiff, LUMPKINS, signs, symptoms, and/or complaints to others;

FILED DATE: 9/10/2021 8:29 PM    2021L009092

    d.  Delaying treatment for Plaintiff, LUMPKINS, infection and brain injury; and/or

    e.  Was otherwise negligent.

241.   As a direct and proximate result of the aforementioned acts and/or omissions of ,

CEP AMERICA, individually, and by and through the actions and/or omissions of its actual agents,

apparent agents, and/or employees, including without limit, HALPERN, and/or others, and each

of them, Plaintiff, LUMPKINS, was injured, has endured and will in the future endure pain and

suffering; has become disabled and disfigured; has suffered a loss of the enjoyment of a normal

life; and has been damaged in his capacity to earn a living; and has incurred past and future medical

expenses.

242.   Pursuant to Illinois Code of Civil Procedure, section 2-622, the Affidavit of

Attorney for Plaintiff is attached hereto as Exhibit A.

243.   Pursuant to Illinois Code of Civil Procedure, section 2-622, reports of health care

professionals are attached hereto as Exhibit B

244.   The damages sought in this cause of action exceed the jurisdictional limit of the

Circuit court of Cook County's Law Division. See Affidavit of Plaintiff's counsel regarding

damages sought in this action attached as Exhibit C.

WHEREFORE, Plaintiff, MICHAEL A. LUMPKINS, by and through his attorneys,

SMITH LACIEN LLP, demands judgment against Defendant, CEP AMERICA-ILLINOIS, LLP,

individually, and by and through the actions and/or omissions of its actual agents, apparent agents,

and/or employees, including, without limit, LEIGH A. HALPERN, M.D., and each of them, for

such sum of money in excess of FIFTY THOUSAND DOLLARS ($50,000.00) as shall represent

just and fair representation.

FILED DATE: 9/10/2021 8:29 PM 2021L009092

## COUNT V
### (Medical Negligence – CEP America LLC d/b/a Vituity)

1-238. Plaintiff realleges and incorporated by reference ¶1-238 stated fully herein.

239. On or about September 10, 2019, and at all times material, , VITUITY, individually, and by and through the actions and/or omissions of its actual agents, apparent agents, and/or employees, including without limit, HALPERN, and/or others, and each of them, had a duty to possess and apply the knowledge and exercise the care and skill of a reasonably well-qualified health care provider under the same or similar circumstances

240. At all times material, VITUITY, individually, and by and through the actions and/or omissions of its actual agents, apparent agents, and/or employees, including without limit, HALPERN, and/or others, and each of them, was negligent in one or more of the ways:

    a. Failing to timely diagnose and treat Plaintiff, LUMPKINS;

    b. Failing to the significance of Plaintiff, LUMPKINS, signs, symptoms, and/or complaints;

    c. Failing to fully communicate Plaintiff, LUMPKINS, signs, symptoms, and/or complaints to others;

    d. Delaying treatment for Plaintiff, LUMPKINS, infection and brain injury; and/or

    e. Was otherwise negligent.

241. As a direct and proximate result of the aforementioned acts and/or omissions of , VITUITY, individually, and by and through the actions and/or omissions of its actual agents, apparent agents, and/or employees, including without limit, HALPERN, and/or others, and each of them, Plaintiff, LUMPKINS, was injured, has endured and will in the future endure pain and suffering; has become disabled and disfigured; has suffered a loss of the enjoyment of a normal life; and has been damaged in his capacity to earn a living; and has incurred past and future medical expenses.

FILED DATE: 9/10/2021 8:29 PM 2021L009092

242.  Pursuant to Illinois Code of Civil Procedure, section 2-622, the Affidavit of Attorney for Plaintiff is attached hereto as Exhibit A.

243.  Pursuant to Illinois Code of Civil Procedure, section 2-622, reports of health care professionals are attached hereto as Exhibit B

244.  The damages sought in this cause of action exceed the jurisdictional limit of the Circuit court of Cook County's Law Division. See Affidavit of Plaintiff's counsel regarding damages sought in this action attached as Exhibit C.

WHEREFORE, Plaintiff, MICHAEL A. LUMPKINS, by and through his attorneys, SMITH LACIEN LLP, demands judgment against Defendant, CEP AMERICA LLC d/b/a VITUITY, individually, and by and through the actions and/or omissions of its actual agents, apparent agents, and/or employees, including, without limit, LEIGH A. HALPERN, M.D., and each of them, for such sum of money in excess of FIFTY THOUSAND DOLLARS ($50,000.00) as shall represent just and fair representation.

### COUNT VI
(Medical Negligence – Darren B. Van Beek, M.D.)

1-238.  Plaintiff realleges and incorporated by reference ¶1-238 stated fully herein.

239.  On or about September 10, 2019, and at all times material, VAN BEEK, individually, and as actual agents, apparent agents, and/or employees of PALOS, and/or RADIOLOGY, and each of them, had a duty to possess and apply the knowledge and exercise the care and skill of a reasonably well-qualified health care provider under the same or similar circumstances

FILED DATE: 9/10/2021 8:29 PM    2021L009092

240.    At all times material, VAN BEEK, individually, and as actual agents, apparent agents, and/or employees of PALOS, and/or RADIOLOGY, was negligent in one or more of the ways:

    a.  Failing to timely diagnose and treat Plaintiff, LUMPKINS;

    b.  Failing to the significance of Plaintiff, LUMPKINS, signs, symptoms, and/or complaints;

    c.  Failing to fully communicate Plaintiff, LUMPKINS, signs, symptoms, and/or complaints to others;

    d.  Delaying treatment for Plaintiff, LUMPKINS, infection and brain injury; and/or

    e.  Was otherwise negligent.

241.    As a direct and proximate result of the aforementioned acts and/or omissions of , VAN BEEK, individually, and as actual agent, apparent agent, and/or employee of PALOS, and/or RADIOLOGY, Plaintiff, LUMPKINS, was injured, has endured and will in the future endure pain and suffering; has become disabled and disfigured; has suffered a loss of the enjoyment of a normal life; and has been damaged in his capacity to earn a living; and has incurred past and future medical expenses.

242.    Pursuant to Illinois Code of Civil Procedure, section 2-622, the Affidavit of Attorney for Plaintiff is attached hereto as Exhibit A.

243.    Pursuant to Illinois Code of Civil Procedure, section 2-622, reports of health care professionals are attached hereto as Exhibit B

244.    The damages sought in this cause of action exceed the jurisdictional limit of the Circuit court of Cook County's Law Division. See Affidavit of Plaintiff's counsel regarding damages sought in this action attached as Exhibit C.

FILED DATE: 9/10/2021 8:29 PM   2021L009092

WHEREFORE, Plaintiff, MICHAEL A. LUMPKINS, by and through his attorneys, SMITH LACIEN LLP, demands judgment against Defendant, DARREN B. VAN BEEK, M.D., individually, and as actual agent, apparent agent, and/or employee of PALOS COMMUNITY HOSPITAL d/b/a PALOS HOSPITAL d/b/a NORTHWESTERN MEDICINE PALOS HOSPITAL, and/or RADIOLOGY & NUCLEAR CONSULTANTS, LTD., and each of them, for such sum of money in excess of FIFTY THOUSAND DOLLARS ($50,000.00) as shall represent just and fair representation.

## COUNT VII
(Medical Negligence – Radiology & Nuclear Consultants, LTD.)

1-238.  Plaintiff realleges and incorporated by reference ¶1-238 stated fully herein.

239.  On or about September 10, 2019, and at all times material,  RADIOLOGY, individually, and by and through the actions and/or omissions of its actual agents, apparent agents, and/or employees, including without limit, VAN BEEK, and/or others, and each of them, had a duty to possess and apply the knowledge and exercise the care and skill of a reasonably well-qualified health care provider under the same or similar circumstances

240.  At all times material, RADIOLOGY, individually, and by and through the actions and/or omissions of its actual agents, apparent agents, and/or employees, including without limit, VAN BEEK, and/or others, and each of them, was negligent in one or more of the ways:

    a.  Failing to properly diagnose and treat Plaintiff, LUMPKINS;

    b.  Failing to advise Plaintiff, LUMPKINS, to a specialist for treatment of his complaints, signs, and/or conditions;

    c.  Failing to refer Plaintiff, LUMPKINS, to a specialist for treatment of his complaints, signs, and/or conditions; and/or

    d.  Was otherwise negligent.

FILED DATE: 9/10/2021 8:29 PM   2021L009092

241.    As a direct and proximate result of the aforementioned acts and/or omissions of ,
RADIOLOGY, individually, and by and through the actions and/or omissions of its actual agents,
apparent agents, and/or employees, including without limit, VAN BEEK, and/or others, and each
of them, Plaintiff, LUMPKINS, was injured, has endured and will in the future endure pain and
suffering; has become disabled and disfigured; has suffered a loss of the enjoyment of a normal
life; and has been damaged in his capacity to earn a living; and has incurred past and future medical
expenses.

242.    Pursuant to Illinois Code of Civil Procedure, section 2-622, the Affidavit of
Attorney for Plaintiff is attached hereto as Exhibit A.

243.    Pursuant to Illinois Code of Civil Procedure, section 2-622, reports of health care
professionals are attached hereto as Exhibit B

244.    The damages sought in this cause of action exceed the jurisdictional limit of the
Circuit court of Cook County's Law Division. See Affidavit of Plaintiff's counsel regarding
damages sought in this action attached as Exhibit C.

WHEREFORE, Plaintiff, MICHAEL A. LUMPKINS, by and through his attorneys,
SMITH LACIEN LLP, demands judgment against Defendant, RADIOLOGY & NUCLEAR
CONSULTANTS, LTD., including, without limit, DARREN B. VAN BEEK, M.D., and each of
them, for such sum of money in excess of FIFTY THOUSAND DOLLARS ($50,000.00) as shall
represent just and fair representation.

FILED DATE: 9/10/2021 8:29 PM   2021L009092

Respectfully Submitted,

**SMITH LACIEN LLP**

/s/Brian LaCien
*Attorney for Plaintiff*

Brian LaCien
Todd A. Smith
**SMITH LACIEN LLP**
70 West Madison Street
Suite 2250
Chicago, IL 60602
(312) 509-8900
Attorney No. 64554

**IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, LAW DIVISION**

FILED DATE: 9/10/2021 8:29 PM    2021L009092

| | | |
|---|---|---|
| MICHAEL A. LUMPKINS | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | Case No. |
| | ) | |
| v. | ) | **JURY DEMANDED** |
| | ) | |
| JUUL LABS, INC., previously d/b/a as PAX LABS, INC. | ) | |
| and PLOOM INC, individually, and by and through the | ) | |
| actions and/or omissions of its actual agents, apparent | ) | |
| agents, and or employees; ALTRIA GROUP, INC., | ) | |
| individually, and by and through the actions and/or | ) | |
| omissions of its actual agents, apparent agents, and/or | ) | |
| employees; PHILIP MORRIS USA, INC., individually, | ) | |
| and by and through the actions and/or omissions of its | ) | |
| actual agents, apparent agents, and/or employees; | ) | |
| ALTRIA CLIENT SERVICES LLC, individually, and | ) | |
| by and through the actions and/or omissions of its actual | ) | |
| agents, apparent agents, and/or employees; ALTRIA | ) | |
| GROUP DISTRIBUTION COMPANY, individually, and | ) | |
| by and through the actions and/or omissions of its actual | ) | |
| agents, apparent agents, and/or employees; ALTRIA | ) | |
| ENTERPRISES LLC, individually, and by and through | ) | |
| the actions and/or omissions of its actual agents, apparent | ) | |
| agents, and/or employees; MOTHER MURPHY'S LABS, | ) | |
| INC., individually, and by and through the actions and/or | ) | |
| omissions of its actual agents, apparent agents, and/or | ) | |
| employees; ALTERNATIVE INGREDIENTS, INC., | ) | |
| individually, and by and through the actions and/or | ) | |
| omissions of its actual agents, apparent agents, and/or | ) | |
| employees; TOBACCO TECHNOLOGY, INC., | ) | |
| individually, and by and through the actions and/or | ) | |
| omissions of its actual agents, apparent agents, and/or | ) | |
| employees; ELIQUITECH, INC., individually, and by and | ) | |
| through the actions and/or omissions of its actual agents, | ) | |
| apparent agents, and/or employees; MCLANE | ) | |
| COMPANY, INC., individually, and by and through the | ) | |
| actions and/or omissions of its actual agents, apparent | ) | |
| agents, and/or employees; EBY-BROWN COMPANY, | ) | |
| LLC, individually, and by and through the actions and/or | ) | |
| omissions of its actual agents, apparent agents, and/or | ) | |
| employees; CORE-MARK HOLDING | ) | |
| COMPANY, INC., individually, and by and through the | ) | |

78

FILED DATE: 9/10/2021 8:29 PM   2021L009092

actions and/or omissions of its actual agents, apparent )
agents, and/or employees; WALGREENS CO., )
individually, and by and through the actions and/or )
omissions of its actual agents, apparent agents, )
and/or employees; PALOS COMMUNITY HOSPITAL )
d/b/a PALOS HOSPITAL d/b/a NORTHWESTERN )
MEDICINE PALOS HOSPITAL, individually, and by )
and through the actions and/or omissions of its actual )
agents, apparent agents, and/or employees, including )
without limit, LEIGH A. HALPERN, M.D., DARREN )
B. VAN BEEK, M.D.; LEIGH A. HALPERN, M.D., )
individually, and as actual agent, apparent agent, and/or )
employee of PALOS COMMUNITY HOSPITAL )
d/b/a PALOS HOSPITAL d/b/a NORTHWESTERN )
MEDICINE PALOS HOSPITAL, CEP AMERICA- )
ILLINOIS, LLP, and/or CEP AMERICA LLC d/b/a )
VITUITY; CEP AMERICA-ILLINOIS, LLP, individually, )
and by and through the actions and/or omissions of its )
actual agents, apparent agents, and/or employees, including,)
 without limit, LEIGH A. HALPERN, M.D.; CEP )
AMERICA LLC d/b/a VITUITY, individually, and by )
and through the actions and/or omissions of its actual )
agents, apparent agents, and/or employees, including, )
without limit, LEIGH A. HALPERN, M.D.; DARREN B. )
VAN BEEK, M.D., individually, and as actual agent, )
apparent agent, and/or employee of PALOS )
COMMUNITY HOSPITAL d/b/a PALOS HOSPITAL )
d/b/a NORTHWESTERN MEDICINE PALOS )
HOSPITAL, and/or RADIOLOGY & NUCLEAR )
CONSULTANTS, LTD.; and/or RADIOLOGY & )
NUCLEAR CONSULTANTS, LTD., including, without )
limit, DARREN B. VAN BEEK, M.D. )
 )
     Defendants. )

## AFFIDAVIT

The Affiant Brian LaCien, being duly sworn on oath states:

1.   I am one of the attorneys for the Plaintiff in the above cause of action.

2.   Our office was unable to obtain a consultation by a qualified health professional prior to filing this action because the statute of limitations would impair the action and the consultation required under 735 ILCS 5/2-622(a)(1) could not be obtained before the expiration of the limitations period.

FILED DATE: 9/10/2021 8:29 PM 2021L009092

3.    That a request has been made by the plaintiff for examination and copying of records pursuant to Part 20 of Article VIII of this Code and the party required to comply under those Sections has failed to produce such records within 60 days of the receipt of this request.

4.    That the Certificate and Written Report required by paragraph 1 shall be filed within 90 days following receipt of the required records. All defendants, except those whose failure to comply with Part 20 Article VIII of this code is the basis for an affidavit under this paragraph, shall be excused from answering or otherwise pleading until 30 days after being served with the certificate required paragraph 1.

FURTHER AFFIANT SAYETH NOT.

_____
Brian LaCien

Under penalties as provided by law pursuant to Section 1-109 of the Code of Civil Procedure, the undersigned certifies that the statements set forth in this instrument are true and correct, except as to matters therein stated to be on information and belief and as to such matters the undersigned certifies as aforesaid that he verily believes the same to be true.

SMITH LACIEN LLP
70 West Madison Street, Suite 2250
Chicago, IL 60602-4212
Phone: (312) 509-8900
Attorney No. 64554

FILED
9/10/2021 8:29 PM
IRIS Y. MARTINEZ
CIRCUIT CLERK
COOK COUNTY, IL

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
## COUNTY DEPARTMENT, LAW DIVISION

FILED DATE: 9/10/2021 8:29 PM   2021L009092

| | |
|---|---|
| MICHAEL A. LUMPKINS | ) |
| | ) |
| | ) |
| Plaintiff, | ) Case No. 2021L009092 |
| | ) |
| v. | ) **JURY DEMANDED** |
| | ) |
| JUUL LABS, INC., previously d/b/a as PAX LABS, INC. | ) |
| and PLOOM INC, individually, and by and through the | ) |
| actions and/or omissions of its actual agents, apparent | ) |
| agents, and or employees; ALTRIA GROUP, INC., | ) |
| individually, and by and through the actions and/or | ) |
| omissions of its actual agents, apparent agents, and/or | ) |
| employees; PHILIP MORRIS USA, INC., individually, | ) |
| and by and through the actions and/or omissions of its | ) |
| actual agents, apparent agents, and/or employees; | ) |
| ALTRIA CLIENT SERVICES LLC, individually, and | ) |
| by and through the actions and/or omissions of its actual | ) |
| agents, apparent agents, and/or employees; ALTRIA | ) |
| GROUP DISTRIBUTION COMPANY, individually, and | ) |
| by and through the actions and/or omissions of its actual | ) |
| agents, apparent agents, and/or employees; ALTRIA | ) |
| ENTERPRISES LLC, individually, and by and through | ) |
| the actions and/or omissions of its actual agents, apparent | ) |
| agents, and/or employees; MOTHER MURPHY'S LABS, | ) |
| INC., individually, and by and through the actions and/or | ) |
| omissions of its actual agents, apparent agents, and/or | ) |
| employees; ALTERNATIVE INGREDIENTS, INC., | ) |
| individually, and by and through the actions and/or | ) |
| omissions of its actual agents, apparent agents, and/or | ) |
| employees; TOBACCO TECHNOLOGY, INC., | ) |
| individually, and by and through the actions and/or | ) |
| omissions of its actual agents, apparent agents, and/or | ) |
| employees; ELIQUITECH, INC., individually, and by and | ) |
| through the actions and/or omissions of its actual agents, | ) |
| apparent agents, and/or employees; MCLANE | ) |
| COMPANY, INC., individually, and by and through the | ) |
| actions and/or omissions of its actual agents, apparent | ) |
| agents, and/or employees; EBY-BROWN COMPANY, | ) |
| LLC, individually, and by and through the actions and/or | ) |
| omissions of its actual agents, apparent agents, and/or | ) |
| employees; CORE-MARK HOLDING | ) |
| COMPANY, INC., individually, and by and through the | ) |

FILED DATE: 9/10/2021 8:29 PM   2021L009092

actions and/or omissions of its actual agents, apparent )
agents, and/or employees; WALGREENS CO., )
individually, and by and through the actions and/or )
omissions of its actual agents, apparent agents, )
and/or employees; PALOS COMMUNITY HOSPITAL )
d/b/a PALOS HOSPITAL d/b/a NORTHWESTERN )
MEDICINE PALOS HOSPITAL, individually, and by )
and through the actions and/or omissions of its actual )
agents, apparent agents, and/or employees, including )
without limit, LEIGH A. HALPERN, M.D., DARREN )
B. VAN BEEK, M.D.; LEIGH A. HALPERN, M.D., )
individually, and as actual agent, apparent agent, and/or )
employee of PALOS COMMUNITY HOSPITAL )
d/b/a PALOS HOSPITAL d/b/a NORTHWESTERN )
MEDICINE PALOS HOSPITAL, CEP AMERICA- )
ILLINOIS, LLP, and/or CEP AMERICA LLC d/b/a )
VITUITY; CEP AMERICA-ILLINOIS, LLP, individually, )
and by and through the actions and/or omissions of its )
actual agents, apparent agents, and/or employees, including,)
 without limit, LEIGH A. HALPERN, M.D.; CEP )
AMERICA LLC d/b/a VITUITY, individually, and by )
and through the actions and/or omissions of its actual )
agents, apparent agents, and/or employees, including, )
without limit, LEIGH A. HALPERN, M.D.; DARREN B. )
VAN BEEK, M.D., individually, and as actual agent, )
apparent agent, and/or employee of PALOS )
COMMUNITY HOSPITAL d/b/a PALOS HOSPITAL )
d/b/a NORTHWESTERN MEDICINE PALOS )
HOSPITAL, and/or RADIOLOGY & NUCLEAR )
CONSULTANTS, LTD.; and/or RADIOLOGY & )
NUCLEAR CONSULTANTS, LTD., including, without )
limit, DARREN B. VAN BEEK, M.D. )
)
        Defendants. )

## AFFIDAVIT

The Affiant Brian LaCien, being duly sworn on oath states:

5.   I am one of the attorneys for the Plaintiff in the above cause of action.

6.   The money damages sought in this cause of action are in excess of fifty thousand dollars ($ 50,000.00).

FURTHER AFFIANT SAYETH NOT.

82

FILED DATE: 9/10/2021 8:29 PM   2021L009092

_____
Brian LaCien

Under penalties as provided by law pursuant to Section 1-109 of the Code of Civil Procedure, the undersigned certifies that the statements set forth in this instrument are true and correct, except as to matters therein stated to be on information and belief and as to such matters the undersigned certifies as aforesaid that he verily believes the same to be true.

SMITH LACIEN LLP
70 West Madison Street, Suite 2250
Chicago, IL 60602-4212
Phone: (312) 509-8900
Attorney No. 64554

**12-Person Jury**

FILED
9/10/2021 8:29 PM
IRIS Y. MARTINEZ
CIRCUIT CLERK
COOK COUNTY, IL
14780024

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, LAW DIVISION

FILED DATE: 9/10/2021 8:29 PM   2021L009092

MICHAEL A. LUMPKINS )
)
)
Plaintiff, )
)
v. )
)
JUUL LABS, INC., previously d/b/a as PAX LABS, INC. )
and PLOOM INC, individually, and by and through the )
actions and/or omissions of its actual agents, apparent )
agents, and or employees; ALTRIA GROUP, INC., )
individually, and by and through the actions and/or )
omissions of its actual agents, apparent agents, and/or )
employees; PHILIP MORRIS USA, INC., individually, )
and by and through the actions and/or omissions of its )
actual agents, apparent agents, and/or employees; )
ALTRIA CLIENT SERVICES LLC, individually, and )
by and through the actions and/or omissions of its actual )
agents, apparent agents, and/or employees; ALTRIA )
GROUP DISTRIBUTION COMPANY, individually, and )
by and through the actions and/or omissions of its actual )
agents, apparent agents, and/or employees; ALTRIA )
ENTERPRISES LLC, individually, and by and through )
the actions and/or omissions of its actual agents, apparent )
agents, and/or employees; MOTHER MURPHY'S LABS, )
INC., individually, and by and through the actions and/or )
omissions of its actual agents, apparent agents, and/or )
employees; ALTERNATIVE INGREDIENTS, INC., )
individually, and by and through the actions and/or )
omissions of its actual agents, apparent agents, and/or )
employees; TOBACCO TECHNOLOGY, INC., )
individually, and by and through the actions and/or )
omissions of its actual agents, apparent agents, and/or )
employees; ELIQUITECH, INC., individually, and by and )
through the actions and/or omissions of its actual agents, )
apparent agents, and/or employees; MCLANE )
COMPANY, INC., individually, and by and through the )
actions and/or omissions of its actual agents, apparent )
agents, and/or employees; EBY-BROWN COMPANY, )
LLC, individually, and by and through the actions and/or )
omissions of its actual agents, apparent agents, and/or )
employees; CORE-MARK HOLDING )
COMPANY, INC., individually, and by and through the )

Case No.  **2021L009092**

**JURY DEMANDED**